## McCAIN ET AL. *v.* LYBRAND ET AL.

No. 82–282.   Argued October 31, 1983—Decided February 21, 1984

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and O'CONNOR, JJ., joined. BLACKMUN, POWELL, and REHNQUIST, JJ., concurred in the judgment.

*Laughlin McDonald* argued the cause for appellants. With him on the brief were *Neil Bradley, Christopher Coates, Armand Derfner,* and *Herbert E. Buhl III.*

*Barbara E. Etkind* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Solicitor General Wallace, Carolyn F. Corwin, Jessica Dunsay Silver,* and *James W. Clute.*

*Karen LeCraft Henderson* argued the cause for appellees. With her on the brief were *T. Travis Medlock,* Attorney General of South Carolina, *Treva G. Ashworth,* Senior Assistant Attorney General, and *Charles W. Coleman.*

JUSTICE STEVENS delivered the opinion of the Court.

In 1966, South Carolina enacted a statute that altered Edgefield County's election practices but the statute was not submitted to federal officials for their approval as required by the Voting Rights Act of 1965.[1] In 1971, the statute was amended, modifying the 1966 election practices, and state officials submitted the amendment to the Attorney General for his approval. In response to a request from the Attorney General, state officials provided him with additional documentation in support of their submission, including the 1966 statute. The Attorney General approved the submission, stating that he did not object to the change in question. The

---

[1] The Voting Rights Act of 1965 requires certain States and political subdivisions to submit all changes in election practices to a three-judge panel of the United States District Court for the District of Columbia or the Attorney General of the United States. Covered jurisdictions may not implement any new election practices until the three-judge panel enters a declaratory judgment approving the changes or the Attorney General accepts the changes by either explicitly stating he does not object to them or by failing to interpose an objection within a prescribed time period. See *infra,* at 244–249.

question in this case is whether the Attorney General's approval of the 1971 submission can be deemed to have the effect of ratifying the changes embodied in the 1966 enactment. We hold that the 1966 changes have not been approved.

## I

As of November 1, 1964, local political authority in Edgefield County, South Carolina, was vested in a County Supervisor and a Board of County Commissioners.[2]  The County Supervisor, the chairman of the three-member Board, was elected at large for a 4-year term.  The County Supervisor had jurisdiction over public roads, matters relating to county taxes and expenditures, and certain other matters.  The other two seats on the Board were appointed offices.  These two commissioners were appointed by the Governor, also for 4-year terms, upon the recommendation of a majority of the county's delegation in the state legislature after a county-wide straw vote on prospective appointees.  There were no residency requirements for commissioners.  The Board had limited administrative and ministerial powers.[3]

On June 1, 1966, the South Carolina General Assembly enacted Act No. 1104, which was effective as a matter of state law when it was signed by the Governor on June 7, 1966. The Act created a new form of government for Edgefield County, altering the county's election practices.  The office of County Supervisor and the Board of County Commissioners were abolished upon expiration of the incumbents' terms. A three-member County Council with broad legislative and administrative powers was created,[4] and the county was

---

[2] App. 142–153.

[3] See *ibid.;* see generally *Blanding* v. *Dubose,* 509 F. Supp. 1334, 1335 (SC 1981), rev'd, 454 U. S. 393 (1982).

[4] It was authorized to buy or sell property, to exercise the powers of eminent domain, to make appropriations and levy taxes, to provide necessary county services, to receive and disburse funds, to incur indebtedness, to issue bonds, to prescribe methods of accounting for accounting officers,

divided into three residency districts for purposes of electing Council members. To qualify as a candidate for a seat on the Council under the Act, an individual must be a qualified voter in one of the three districts and is required to register as a candidate from that district. The Council members, however, are elected at large: voters throughout the county cast votes for a candidate from each district, and the candidate in each district with the largest number of votes occupies that district's seat on the Council. Council members are elected for 2-year terms, and the members themselves annually elect a chairman.

The 1966 Act was amended in 1971 by Act No. 521, "An Act to Amend Act No. 1104 of 1966 . . . So As To Increase The Number of Districts And The Number of County Council Members."[5] The 1971 amendment increased the number of residency districts, and thus the number of Council members, from three to five. Necessarily the change in the number of districts resulted in new district boundaries. Otherwise, the 1971 amendment did not alter the 1966 Act.

County Council elections in Edgefield County have been conducted under the basic scheme established by the 1966 Act since the first elections held pursuant to the Act in November 1966.

In 1971, state officials sent a letter to the Attorney General of the United States stating: "In accordance with the provisions of Section 5 of the Voting Rights Act of 1965, there are submitted herewith copies" of 18 listed recent state enactments, which included the 1971 amendment regarding Edge-

---

and to employ county employees. The 1966 Act required the Council to employ a county administrative officer who could not be a Council member. Act No. 55 of February 23, 1967, made employment of a county administrative officer permissive rather than mandatory.

[5] Prior to the 1971 amendment, the 1966 Act had been amended in 1967 by Act No. 55 and in 1968 by Act No. 1318. App. 171–177. These earlier amendments apparently did not change any election practices and are not at issue in this case.

field County.[6]  The Justice Department responded to the request for clearance of the 1971 amendment by stating: "After a preliminary examination of H2206 [the 1971 amendment], it does not appear that we have sufficient information to evaluate the change you have submitted."[7]  The Justice Department therefore requested additional information from state officials—maps showing boundaries of current districts, population and registration statistics, recent election returns, "a copy of the election statute now in force"—and noted that the time limitation on consideration of the request would begin to run when the relevant information "necessary to evaluate H2206" was provided.[8]  State officials forwarded the requested information "concerning the legislation that required further clarification (H2206)" to the Justice Department, including a copy of the 1966 Act.[9]  The Justice Department letter in response stated that it was "concerning the submission of H2206 to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended," and then stated: "The Attorney General does not interpose any objections to the change in question."[10]

## II

The appellants, black voters residing in Edgefield County, South Carolina, commenced a class action in 1974 in the United States District Court for the District of South Carolina challenging the county's election practices on constitutional grounds.  Specifically, they alleged in their complaint

---

[6] App. to Brief for United States as *Amicus Curiae* 1a–2a (letter of July 21, 1971).

[7] Defendants' Exhibit X, p. 1.

[8] *Id.*, at 1, 2.

[9] Defendants' Exhibit Y.  It is not entirely clear that the entire text of the 1966 Act was provided to the Attorney General, but for our purposes we shall assume that the Attorney General was aware of the full text.

[10] Defendants' Exhibit Z.

against appellees, various county officials including the County Council members, that the county's at-large method of electing the County Council diluted the voting strength of black voters and that the county's residency districts were malapportioned. The District Court entered judgment in favor of appellants on the malapportionment claim, but that judgment was reversed on appeal. *Lytle* v. *Commissioners of Election*, 376 F. Supp. 304 (SC), rev'd, 509 F. 2d 1049, 1032 (CA4), cert. denied *sub nom. McCain* v. *Lybrand*, 419 U. S. 1032 (1974). After years of litigation and unsuccessful settlement negotiations, the District Court entered judgment in favor of appellants on their constitutional claim challenging the method of electing the Council at large from residency districts and enjoined further elections for the County Council until adoption of a new method of election, Record, Doc. Nos. 27, 28 (orders of Apr. 17, 1980, and Apr. 22, 1980). A few months later, the District Court vacated the judgment and ordered further proceedings in light of this Court's intervening decision in *City of Mobile* v. *Bolden*, 446 U. S. 55 (1980). Record, Doc. No. 31 (order of Aug. 8, 1980).

While continuing to press their constitutional claim in the District Court, appellants then filed an amended complaint, alleging that the 1966 Act had never been submitted to federal officials as required by §5 of the Voting Rights Act of 1965. 79 Stat. 439, as amended, 42 U. S. C. §1973c. A three-judge District Court was convened to decide this claim. That court reviewed South Carolina's 1971 submission and noted that the Justice Department had been made aware of the provisions of the 1966 Act. The District Court concluded that the Justice Department's request for additional information "indicates that Justice Department's review of [the 1971 Act] encompassed all aspects of the Act, including the effect of the at-large with residency requirement voting that had been implemented in 1966." App. to Juris. Statement 12a. The District Court did not find, however, that the Justice Department had been provided with any information concerning

voting practices prior to 1966, or that it had been made aware of the fact that the 1966 Act embodied election practices different from those that had been in effect before 1966. Nevertheless, the District Court concluded that the Attorney General's approval of the 1971 Act, which both changed the 1966 Act by increasing the size of the Council and reenacted its remaining provisions, "renders moot any objection to the superceded 1966 provisions." *Id.*, at 13a.

After obtaining the views of the Solicitor General, who urged summary reversal of the District Court's judgment, we noted probable jurisdiction, 462 U. S. 1130 (1983), and for the reasons which follow, we now reverse.

## III

The Fifteenth Amendment commands: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." The Voting Rights Act of 1965, as amended, 42 U. S. C. § 1973 *et seq.* (1976 ed. and Supp. V),[11] was enacted by Congress as a response to the "unremitting and ingenious defiance" of the command of the Fifteenth Amendment for nearly a century by state officials in certain parts of the Nation. *South Carolina* v. *Katzenbach*, 383 U. S. 301, 309 (1966). Congress concluded that case-by-case litigation under previous legislation was an unsatisfactory method to uncover and remedy the systematic discriminatory election practices in certain areas: such lawsuits were too onerous and time-consuming to prepare, obstructionist tactics by those determined to perpetuate discrimination yielded unacceptable delay, and even successful lawsuits too often merely resulted in a change in

[11] The Voting Rights Act was enacted in 1965, Pub. L. 89–110, 79 Stat. 437, and was amended and extended in 1970, Pub. L. 91–285, 84 Stat. 314, in 1975, Pub. L. 94–73, 89 Stat. 400, and in 1982, Pub. L. 97–205, 96 Stat. 131.

methods of discrimination. *E. g.*, H. R. Rep. No. 439, 89th Cong., 1st Sess., 9–11 (1965). Congress decided "to shift the advantage of time and inertia from the perpetrators of the evil to its victims," 383 U. S., at 328, and enacted "stringent new remedies" designed to "banish the blight of racial discrimination in voting" once and for all, *id.*, at 308.

The "preclearance" requirement mandated by § 5 of the Act is perhaps the most stringent of these remedies, and certainly the most extraordinary.[12] It prohibits jurisdictions

---

[12] The current codification of § 5 is as follows:

"§ 1973c. Alteration of voting qualifications and procedures; action by state or political subdivision for declaratory judgment of no denial or abridgement of voting rights; three judge district court; appeal to Supreme Court

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced with-

which had engaged in certain violations of the Fifteenth Amendment from implementing any election practices different from those in effect on November 1, 1964, pending scrutiny by federal officials to determine whether the changes are racially discriminatory in purpose or effect. "The language of § 5 clearly provides that it applies only to proposed changes in voting procedures." *Beer* v. *United States*, 425 U. S. 130, 138 (1976). Statutory provisions constituting changes in election practices are not "effective as laws until and unless [they are] cleared pursuant to § 5." *Connor* v. *Waller*, 421 U. S. 656 (1975) *(per curiam)*. The rationale of this "uncommon exercise" of congressional power which sustained its constitutional validity was a presumption that jurisdictions which had "resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees" would be likely to engage in "similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself." *South Carolina*

---

out such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 and any appeal shall lie to the Supreme Court." 42 U. S. C. § 1973c.

v. *Katzenbach, supra,* at 334, 335 (footnote omitted). This provision must, of course, be interpreted in light of its prophylactic purpose and the historical experience which it reflects. See, *e. g., McDaniel* v. *Sanchez,* 452 U. S. 130, 151 (1981).

Section 5 of the Voting Rights Act of 1965, as originally enacted, required a covered State or political subdivision desiring to implement any election practices different from those in effect on November 1, 1964, to obtain a declaratory judgment from a three-judge panel of the United States District Court for the District of Columbia holding that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" before the new practice could be implemented. 79 Stat. 439. A proviso in § 5, however, established an alternative method of obtaining federal clearance of the measure: if the new election practice was submitted to the Attorney General of the United States and the Attorney General did not interpose an objection within 60 days of the submission, the jurisdiction was permitted to implement the change.

The original voting rights bill did not contain this alternative preclearance method; but after concerns arose that the declaratory judgment route would unduly delay implementation of nondiscriminatory legislation, it appears that the proviso was added "to provide a speedy alternative method of compliance to covered States." *Morris* v. *Gressette,* 432 U. S. 491, 503 (1977). While the legislative history of the proviso is sparse, *ibid.,* the history which does exist and the lack of controversy surrounding the proviso indicate that Congress in no way intended that the substantive protections of § 5 be sacrificed in the name of expediency, though it did logically anticipate that most jurisdictions would opt for the alternative preclearance method and that declaratory judgment actions would likely be limited to those occasions on which the Attorney General interposed an objection, see H. R. Rep. No. 439, 89th Cong., 1st Sess., 26 (1965); Hear-

ings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 237 (1965) (statement of Attorney General Katzenbach). We have previously recognized that the declaratory judgment proceeding is the "basic mechanism" for preclearance established by the Act, *United States* v. *Sheffield Board of Comm'rs*, 435 U. S. 110, 136 (1978), and that the "provision for submission to the Attorney General merely gives the covered State a rapid method of rendering a new state election law enforceable." *Allen* v. *State Board of Elections*, 393 U. S. 544, 549 (1969); *Georgia* v. *United States*, 411 U. S. 526, 538 (1973). Indeed, irrespective of which avenue of preclearance the covered jurisdiction chooses, it has the same burden of demonstrating that the changes are not motivated by a discriminatory purpose and will not have an adverse impact on minority voters, *McDaniel* v. *Sanchez*, 452 U. S. 130, 137 (1981); *Georgia* v. *United States, supra,* at 538, and federal officials are confronted with the same "difficult substantive issue." *Allen* v. *State Board of Elections, supra,* at 558.

In evaluating the use of the alternative procedure of submitting proposed changes to the Attorney General, it must be remembered that § 5 "was enacted in large part because of the acknowledged and anticipated inability of the Justice Department—given limited resources—to investigate independently all changes with respect to voting enacted by States and subdivisions covered by the Act." *Perkins* v. *Matthews,* 400 U. S. 379, 392, n. 10 (1971). Moreover, it is apparent that ambiguity concerning the scope of a preclearance is more likely if the State opts for the more expeditious method: silence constitutes consent under that method, and even when the Attorney General affirmatively states he has no objection, ambiguity may be present if the State's submission itself is ambiguous. The potential for such ambiguity was particularly pronounced prior to the adoption of detailed regulations by the Justice Department governing preclear-

ance submissions,[13] when covered jurisdictions often merely sent a copy of new legislation to the Attorney General with a general statement that it was being submitted pursuant to § 5.

Congress has amended the Voting Rights Act several times, each time continuing the basic structure of the original preclearance provision.[14] In the legislative history of the extensions of the Act, § 5 has been deemed to be a "vital element" of the Act to ensure that "new subterfuges will be promptly discovered and enjoined." H. R. Rep. No. 91–397, p. 8 (1969). But Congress recognized that it was only as vital as state compliance allowed it to be. Unfortunately it appeared that "States rarely obeyed the mandate of that section, and the Federal Government was too timid in its enforcement." Hearings on H. R. 4249 before the Committee on the Judiciary, 91st Cong., 1st Sess., 4 (1969) (statement of Rep. McCulloch). Few changes were submitted; and only a handful of objections were interposed: "Where local officials have passed discriminatory laws, generally they have not been submitted to the Department of Justice." Hearings on H. R. 4249 before the House Committee on the Judiciary, 91st Cong., 1st Sess., 220 (1969) (statement of Attorney General Mitchell). While compliance with § 5 increased after the 1970 extension of the Voting Rights Act, and the provision was believed to have been largely responsible for gains achieved in minority political participation, H. R. Rep. No. 94–196, pp. 10–11 (1975), the continuing "widespread failure to submit proposed changes in election law for Section 5 review before attempting to implement the change" was recently viewed as "significant evidence of the continuing need for the preclearance requirement." S. Rep. No. 97–417, p. 12 (1982). The Attorney General has attempted to

---

[13] Proposed guidelines were first published for comment in the Federal Register, 36 Fed. Reg. 9781 (1971), then were published in final form, 36 Fed. Reg. 18186 (1971), and have been codified since 1972, 28 CFR § 51.2(c) (1982).

[14] See n. 11, *supra*.

use several methods to identify unsubmitted changes, including the preclearance process itself, but the widespread noncompliance with the preclearance requirement, particularly acute shortly after passage of the Voting Rights Act in 1965, combined with the absence of an independent mechanism in the Justice Department to monitor changes, has permitted circumvention of the requirement which itself was designed to eliminate circumvention of the goals of the Act. H. R. Rep. No. 97–227, p. 13 (1981). Recent efforts to review finally the many unsubmitted changes made shortly after the passage of the Act in 1965 have received unqualified congressional endorsement. *Ibid.*[15]

In light of the structure, purpose, history, and operation of § 5, we have rejected the suggestion that the "Act contemplates that a 'submission' occurs when the Attorney General merely becomes aware of legislation, no matter in what manner," and instead have held that "[a] fair interpretation of the Act requires that the State in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act." *Whitley* v. *Williams*, decided with *Allen* v. *State Board of Elections, supra,* at 571. More recently we stated: "While the Act does provide that inaction by the Attorney General may, under certain circumstances, constitute federal preclearance of a change, the purposes of the Act would plainly be subverted if the Attorney General could ever be deemed to have approved a voting change when the proposal was neither properly submitted nor in fact evaluated by him." *United States* v. *Sheffield Board of Comm'rs, supra,* at 136. This interpretation of the provision is faithful to its history and purpose, while at

---

[15] The Committee Report also expresses concern with respect to the failure of jurisdictions to heed objections interposed by the Attorney General. Indeed, it cites the local officials' response to the Attorney General's 1976 objection to the Edgefield County at-large election system, see n. 30, *infra,* as an example of local defiance of § 5. H. R. Rep. No. 97–227, p. 13 (1981).

the same time leaving ample room for minimizing the "potential severity of the § 5 remedy," *Morris* v. *Gressette*, 432 U. S., at 504.

## IV

Edgefield County is admittedly a political subdivision of South Carolina subject to the provisions of the Voting Rights Act,[16] and it is conceded that the 1966 Act was subject to the preclearance requirement of § 5 of the Act.[17] It is also undisputed that the 1966 Act was never submitted to the Attorney General or the United States District Court for the District of Columbia for § 5 review.[18] Accordingly, unless the pre-

---

[16] See 28 CFR pt. 55 (1982). The District Court expressly so found. See App. to Juris. Statement 6a.

[17] The parties so stipulated. App. 131. See also App. to Juris. Statement 6a.

The only questions in an action alleging a violation of the § 5 preclearance requirement are (1) whether a change is covered by § 5, (2) if the change is covered, whether § 5's approval requirements have been satisfied, and (3) if the requirements have not been satisfied, what relief is appropriate. *Lockhart* v. *United States*, 460 U. S. 125, 129, n. 3 (1983). The question whether the 1966 Act had a discriminatory purpose or effect is not an issue at this stage of the § 5 litigation: that question must be initially decided by the District Court for the District of Columbia or the Attorney General. *Perkins* v. *Matthews*, 400 U. S. 379, 383–385 (1971); *Allen* v. *State Board of Elections*, 393 U. S. 544, 558–559 (1969). Nor is there any question that the Act was required to be submitted for preclearance—the parties have stipulated that submission was required. Given this stipulation, the parties understandably have made little effort to define precisely the nature of the changes in election practices made by the Act which required preclearance, but the briefing indicates that the parties agree that the at-large residency requirement voting scheme constituted such a change. While this matter may be more fully explored in future proceedings after remand, several changes are suggested: the different terms of office for Council members in comparison with the former Board, the basic reallocation of authority from the state legislative delegation to the Council, the shift from two appointed Board positions to at-large election of their Council counterparts, and the residency requirement applicable to all members of the Council.

[18] App. 130–131. The District Court expressly found:

"There is no dispute that Act No. 1104 of 1966 was subject to the preclearance provisions of § 5 of the Act and that county officials should have, but

clearance of the 1971 amendment can be deemed to ratify the changes embodied in the 1966 Act, § 5 of the Voting Rights Act plainly invalidates those changes and the District Court must fashion appropriate relief.

As we previously observed, the preclearance procedures mandated by § 5 of the Voting Rights Act focus entirely on *changes* in election practices. *Supra*, at 245. The title of the 1971 amendment unambiguously identified the changes in election practices which it effected—an increase in the number of Council members and residency districts—and served to define the scope of the preclearance request. An examination of the correspondence concerning the 1971 submission, *supra*, at 240–241, plainly shows that only the 1971 amendment was being considered for preclearance,[19] and further indicates that the request for preclearance was viewed as limited to the change[20] in elections practices effected by it.[21]

did not, submit the Act to the Justice Department or to the District Court for the District of Columbia for preclearance." App. to Juris. Statement 6a.

[19] Given the correspondence concerning the 1971 preclearance, even under appellees' view that a submission consists of an entire statute, rather than the changes in election practices effected by the enactment, there could be no contention in this case that the Attorney General actually considered and approved the 1966 Act itself in the course of preclearing the 1971 amendment. Quite simply, he was never, even by implication, asked to approve the 1966 statute, and he never, even by implication, purported to do so: state officials merely asked him to preclear the 1971 amendment and that is what the Attorney General did. The 1966 Act was indeed sent to the Attorney General, but it manifestly was not submitted to him for preclearance of it; it was sent to him in connection with the request for preclearance of the 1971 amendment, and was a necessary part of the submission of the 1971 amendment because the changes made by that amendment could not be identified without it.

[20] For example, the Attorney General's letter requesting additional information expressly stated: "After a preliminary examination of H2206, it does not appear that we have sufficient information to evaluate *the change you have submitted.*" Defendants' Exhibit X (emphasis supplied).

[21] In construing the correspondence in an attempt to ascertain the significance ascribed to the preclearance by the parties involved, it is significant that the correspondents were a South Carolina Assistant Attorney General

Thus South Carolina's submission of the 1971 amendment increasing the size of the Edgefield County Council apparently required the Attorney General to determine whether either the change in the district boundaries or the change in the number of districts had a discriminatory purpose or effect, but would not appear to have required him to pass on the question whether the 1966 changes represented a setback for minority voters in Edgefield County. The jurisdiction has never submitted that question to the Attorney General and has never attempted to shoulder its burden of demonstrating that the 1966 changes were nondiscriminatory.

The District Court held, however, that the Attorney General's request for additional information (including a copy of the 1966 statute and information concerning previous candidates, election results, and residency district boundaries) indicated that he had considered all aspects of the electoral scheme, including the changes effected in the 1966 Act. App. to Juris. Statement 12a. In the alternative, it held that since the 1971 amendment retained the changes effected by the 1966 Act, the lack of objection to the 1971 submission necessarily constituted approval of those changes as well and rendered the failure to preclear the 1966 Act moot. *Id.*, at 13a.

The significance the District Court attached to the Attorney General's request for additional information was wholly unwarranted. It is plain that the information which the Attorney General requested and received was merely rele-

---

and a United States Assistant Attorney General in the Civil Rights Division. These officials surely knew that the preclearance procedure concerns only changes in election practices, and can be presumed to have chosen their language carefully to identify the scope of the preclearance. In this regard, appellees' contention that the the phrase "change in question" in the preclearance letter was form language is not only unavailing, but counterproductive. Form language is presumably more carefully chosen to reflect departmental policy, practice, and intentions. Moreover, to the extent that state officials had received previous preclearance letters containing such language, they were on notice that a preclearance is limited to the changes which a covered jurisdiction has identified by its submission.

vant to an identification of the changes which he had been requested to approve or to an evaluation of the purpose and effect of the changes made by the 1971 amendment which he did approve: the 1966 Act and the other information served as a benchmark allowing him to quantify the extent of the increase in the size of the Council and to compare the new district boundaries with the earlier ones. His request for and receipt of this information in no way suggest that he approved changes that he was not requested to approve.

Moreover, the information obtained in response to the Attorney General's request did not enable him to ascertain whether a covered change was made by the 1966 Act,[22] much less evaluate whether the changes made by the 1966 scheme—and unaffected by the 1971 amendment—were discriminatory in purpose or effect when compared to the 1964 practices. In order to pass on the 1966 Act, he would have needed information concerning the pre-1966 election law and its practical effects. He neither requested nor received such information.[23] Just as "no one would argue" that the Attor-

---

[22] Particularly in view of the legislature's practice of repealing the existing electoral statute and then reenacting some existing features along with new ones, as it did in 1971, the fact that the 1966 statute on its face was a post-1964 enactment did not necessarily imply that it had effected changes which required § 5 preclearance.

[23] Obviously, in 1971 the Attorney General either did not recognize that the 1966 Act required preclearance or assumed that it had been precleared. In the context of the submission, that was understandable. First, of course, he was not being asked to preclear the provisions of the 1966 Act. Second, the State was requested to provide the Attorney General with a copy of the statute "now in force," and by sending the 1966 Act to the Justice Department in response to this request, the South Carolina Assistant Attorney General was implicitly representing that the 1966 Act either had been precleared or had not required preclearance, for otherwise the pertinent provisions would have had no force as law. *Supra,* at 241. Moreover, though the political subdivisions of South Carolina had notably failed to submit changes on their own initiative, appellees correctly point out that the State of South Carolina was the only jurisdiction to comply rigorously with the preclearance requirement in the early years of the Act. *Perkins* v. *Matthews,* 400 U. S., at 392, n. 11 (citing table prepared by Justice

ney General's "difficult and complex" decision "should be made without adequate information," *Georgia* v. *United States*, 411 U. S., at 540, an argument that such a decision has been made when the record indicates adequate information was lacking carries little weight. And it would require a wild flight of imagination to suggest that the Attorney General recognized that the 1966 Act effected changes which had required preclearance and had never been precleared, and then did not ask state officials to explain the failure to preclear those changes,[24] but instead embarked on the task of gathering the information necessary to evaluate those alterations on his own rather than requesting state officials to provide the information to him as he had just done regarding the changes made by the 1971 amendment. It is even more unlikely that he would have kept his consideration and approval of the changes made by the 1966 Act a secret from state officials in his letter preclearing the 1971 amendment.

In concluding that there is insufficient evidence for a finding that the Attorney General actually considered the changes made by the 1966 Act in preclearing the 1971 amendment, we note that at the time of the 1971 submission, the Attorney General was completing promulgation of regulations governing § 5 submissions.[25] The regulations shed light

---

Department). The Attorney General was obviously aware of that fact, and it is reasonable to infer that the State's compliance during this time period may have buttressed his apparent assumption that the 1966 Act either did not require submission or had been precleared.

[24] If the Attorney General was aware that the Act required preclearance and had never been precleared, his failure to request either an explanation or at least some additional information would be difficult to comprehend. He had testified before Congress that in the Department's experience, compliance with § 5 was largely limited to legitimate statutes and that jurisdictions often failed to submit laws which were discriminatory. *Supra*, at 248. Given this testimony, it seems quite unrealistic to suppose that he would consciously allow the failure to submit the 1966 Act for preclearance to pass without comment.

[25] See n. 13, *supra*.

on the correct interpretation of the scope of the changes encompassed by the Attorney General's preclearance letter, since they make clear the nature of the information necessary to constitute a valid "submission." See 28 CFR § 51.2(c) (1972).[26] The regulations indicate that the focus of the Attorney General's scrutiny of a statute was, understandably, limited to the specific changes submitted for consideration.[27] Finally, the Justice Department has recently indicated that the changes made in the 1966 Act and retained in the 1971 amendment have not been precleared, see App. to Juris. Statement 40a–42a, and such after-the-fact Justice Department statements have been previously relied upon in deter-

---

[26] Under the regulations, a submission must "clearly set forth" the voting change in a manner "adequate to disclose to the Attorney General the difference between the existing and proposed situation with respect to voting." 28 CFR §§ 51.2(c), 51.5, 51.10(a)(4) (1972); 36 Fed. Reg. 18186 (1971). Among other things, a submission must include the date of final adoption of the change affecting voting, § 51.10(a)(2), and a "statement certifying that the change affecting voting has not yet been enforced or administered, or an explanation of why such a statement cannot be made." § 51.10(a)(5). The latter requirement, of course, simply reflects the requirements of § 5 itself, which provides that every change must be precleared before being enforced. Further, the guidelines make clear that submission of a particular change does not encompass all prior changes—precleared or not—that have been made since the Act's effective date in 1964. Another subsection strongly urges that, in addition to required information about the "specific change submitted for consideration," the submitting authority include a copy of "any other changes in law or administration relating to the subject matter of the submitted change affecting voting which have been put into effect since the time when coverage under section 4 of the Voting Rights Act began and the reasons for such prior changes. If such changes have already been submitted the submitting authority may refer to the date of prior submission and identify the previously submitted changes." 28 CFR § 51.10(b)(4) (1972).

[27] Naturally, the Attorney General did not determine whether the differences between the 1971 amendment and the 1966 Act were nondiscriminatory in an analytical vacuum, but necessarily evaluated the purpose and effect of those changes in the context of the entire electoral scheme. See *Lockhart* v. *United States*, 460 U. S., at 131–132.

mining whether a particular change was actually precleared in analogous circumstances, see *United States* v. *Georgia*, Civ. Action No. C76–1531A (ND Ga., Sept. 30, 1977), summarily aff'd, 436 U. S. 941 (1978).

The District Court also erred in viewing the submission's scope as encompassing all features of the 1971 amendment, rather than the changes effected by that particular enactment. When a jurisdiction adopts legislation that makes clearly defined changes in its election practices, sending that legislation to the Attorney General merely with a general request for preclearance pursuant to § 5 constitutes a submission of the changes made by the enactment and cannot be deemed a submission of changes made by previous legislation which themselves were independently subject to § 5 preclearance.[28] The fact that a covered jurisdiction adopted a new election practice after the effective date of the Voting Rights Act raises, in effect, a statutory inference that the practice may have been adopted for a discriminatory purpose or may have a discriminatory effect and places the burden on the jurisdiction to establish that the practice is not discriminatory. A request for preclearance of certain identi-

---

[28] There is an analytical distinction between two questions: whether a particular electoral provision was subject to § 5 preclearance, and whether it was actually submitted for preclearance on a particular occasion. Even though a number of the elements of an electoral scheme are subject to preclearance and should be submitted, only some of those features may actually be submitted for review. In that situation, the Attorney General's failure to object to the submission would not constitute preclearance of elements in the scheme that were not submitted. As we stated in *Morris* v. *Gressette*, 432 U. S. 491, 504 (1977): "The congressional intent is plain: The extraordinary remedy of postponing the implementation of validly enacted state legislation was to come to an end when the Attorney General failed to interpose a timely objection based on a *complete submission*." (Emphasis supplied.)

In this case, state officials had independent submission burdens respecting both the 1966 changes and the 1971 changes, but only met their burden respecting the latter changes.

fied changes in election practices which fails to identify other practices as new ones thus cannot be considered an adequate submission of the latter practices. In this case, the 1971 submission failed to inform the Attorney General that the provisions of the 1971 amendment which merely recodified various practices contained in the 1966 Act were themselves changes that might give rise to an inference of discrimination.

To the extent there was any ambiguity in the scope of the preclearance request, the structure and purpose of the preclearance requirement plainly counsel against resolving such ambiguities in favor of the submitting jurisdiction in the circumstances of this case. The preclearance process is by design a stringent one; it is predicated on the congressional finding that there is a risk that covered jurisdictions may attempt to circumvent the protections afforded by the Act; the burden of proof (the risk of nonpersuasion) is placed upon the covered jurisdiction; and submissions under the alternative preclearance method—adopted for the convenience of the covered jurisdictions while Congress recognized the inability of the Justice Department independently to monitor and to identify changes in election practices—should be carefully construed to protect the remedial aims of the Act. Moreover, the congressional assessment of the practical operation of the provision in the years since its adoption clearly indicates Congress' continuing intent to guard against any diminution in the potency of the provision, and an intent to continue to insist upon submission of changes which had previously not been submitted. The broad scope given to the 1971 submission by the District Court, and its conclusion that submitting the 1971 amendment rendered the failure to preclear the 1966 Act moot, are inconsistent with the foregoing governing principles.

In summary, to the extent the judgment below may be interpreted as resting upon a factual finding that the Attorney General actually considered and approved the changes made

by the 1966 Act in the course of the submission of the 1971 amendment, after reviewing the evidence ourselves we are "left with the definite and firm conviction that a mistake has been committed,"[29] and we thus overturn that finding as clearly erroneous. The District Court erred as a matter of law in concluding that the lack of objection to the 1971 submission rendered the failure to preclear the 1966 Act moot.[30]

Accordingly, we reverse the District Court's judgment and remand to the District Court for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, JUSTICE POWELL, and JUSTICE REHNQUIST concur in the judgment.

---

[29] *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948).

[30] In view of our holding, it is unnecessary for us to address the second question presented by appellants: whether under the circumstances Edgefield County's adoption of a council-administrator form of government in June 1976—objected to by the Attorney General—was subject to § 5 preclearance.