Gloria Artigue JONES, et al.

v.

Edwin EDWARDS, et al.

Civ. A. No. 87–3864.

United States District Court,
E.D. Louisiana.

Oct. 16, 1987.

William P. Quigley, Roy J. Rodney, Jr., New Orleans, La., Julius L. Chambers, Charles Stephen Ralston, Pamela S. Karlan, New York City, for plaintiffs.

William J. Guste, Jr., Atty. Gen., Kendall L. Vick, Asst. Atty. Gen., Arthur J. Finn, Staff Atty. Louisiana Dept. of Justice, New Orleans, La., for defendants Edwin Edwards, James H. Brown, Jerry M. Fowler.

Habans & Bologna, Robert N. Habans, Jr., New Orleans, La., for defendant A.E. Papale.

Before RUBIN, Circuit Judge, and McNAMARA and FELDMAN, District Judges.

## ORDER and REASONS

FELDMAN, District Judge.

Plaintiffs, a class of black registered voters residing in Orleans Parish, brought this action on behalf of all black registered voters similarly situated alleging violation of Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.[1] Specifically, plaintiffs contend that the manner in which the Orleans Parish Registrar of Voters conducted the annual voter canvass and purge in Wards 8 and 9 of the City of New Orleans authorized by Louisiana Revised Statutes 18:192[2] and 18:193[3], constituted "changes" in voter qualification within the

---

1. Plaintiffs reserve for the single-judge court their claim under Section 2 of the Act.

2. Revised Statute 18:192 provides:

 A. (1) In January in each parish the registrar of voters shall annually canvass the names of the registrants in one-fourth of the precincts in the parish, so that all of the names of persons registered in each precinct shall be canvassed at least once every four years. However, commencing in 1990 and every fourth year thereafter, parishes and municipalities with a population of five hundred thousand or more, as based on the most recently published federal decennial census, shall not be required to conduct a canvass in January.

 (2) In conducting the canvass the registrar shall mail to each registrant in the precincts to be canvassed a card on which is plainly typed or printed the registrant's name and address, and his ward and precinct numbers. The card shall instruct the postmaster to deliver only as addressed or to return to sender, with return postage guaranteed. The card shall also instruct the postmaster to provide an address correction when available. If the card is returned, and no address is provided by the postmaster or if the corrected address provided is outside the parish, the registrar then shall follow the procedure set forth in R.S. 18:193 with respect to challenge and cancellation on the ground that the registrar has

meaning of Section 5, which were not pre-cleared as required by the Act.[4] Finding that there was no showing of irreparable harm because improperly purged voters could be immediately restored to the voter rolls, the single judge court denied plaintiffs' request for a temporary restraining order enjoining the Registrar from completing the purge. Pursuant to 28 U.S.C. § 2284, the district judge then granted plaintiffs' request that a three-judge court convene. Plaintiffs ask this three-judge Court to grant preliminary and permanent injunctive relief and all other equitable relief.

Section 5 of the Voting Rights Act provides that a covered State or political subdivision[5] must take certain precautions

"[w]henever [it] ... shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, prac-tice, or procedure with respect to voting different from that in force or effect on November 1, 1964...."

42 U.S.C. § 1973c. Before any such change can be implemented, the State or political subdivision must first obtain approval from the United States District Court for the District of Columbia or, alternatively, administratively from the Attorney General of the United States. The Attorney General may preclear a submitted change either by failing to interpose an objection within sixty days of submission, or by affirmatively indicating during the sixty day review period that an objection will not be made. *Id.* The option of obtaining administrative preclearance from the Attorney General

"was added to the original legislation 'to provide a speedy alternative method of compliance to covered States.'"

reason to believe that the registrant is no longer qualified to be registered. However, if the card is returned with a corrected address within the parish, the registrar shall make the change on his records and mail a new voter identification card to the voter using the corrected address provided by the postmaster. B. The parish governing authority shall provide to the registrar of voters the funding necessary for the conduct of the canvass of the names of registrants as required herein.

3. Revised Statute 18:193 provides as follows:
A. When the registrar has reason to believe that the name of a person has been illegally or fraudulently placed upon the registration records or that a registrant no longer is qualified to be registered, he shall immediately notify the person. The notice shall be mailed first class, postage prepaid, to the registrant's address as it appears on the registration records. The notice shall state the alleged irregularity in registration or the reason for the loss of the right to remain registered. With the notice the registrar shall send a printed citation requiring the person to appear at the office of the registrar within ten days after the date the notice and the citation were mailed and show cause why his name should not be canceled from the voting records. The citation shall specify the date by which compliance will be required.
B. When six or more names have accumulated, or in any event not later than five days after mailing the notice, the registrar shall publish the names of all registrants to whom the notices have been sent, together with a notice requiring them to appear in the registrar's office within three days after the date of the publication and prove the correctness of their registration. The publication of the names shall be arranged alphabetically. The notice and names of such registrants shall be published for one day in the official journal of the parish governing authority or in a newspaper calculated to provide maximum notice in the parish. No such publication shall be made on a Sunday.
C. If the registrant fails to appear within ten days after the date the notice was mailed, or fails to appear within three days after the date of the newspaper notice, whichever date is later, the registrar shall at once cancel his name from the voting records and make a notation of the date and reason of cancellation on the original application. If the registrant appears and shows cause within the time required by this Section why his registration should not be canceled, the registrar shall not cancel the registration.
D. If the registrar determines that a voter's registration has been canceled through error, the registrar shall reinstate the voter's registration as though the cancellation had never occurred and shall notify the registrant of the reinstatement.

4. Prior to their implementation, both R.S. 18:192 and 18:193 were precleared by the Attorney General. Section A of R.S. 18:192 was amended by La.Act 669 of 1986. On December 30, 1986, the Attorney General precleared the amendment as well.

5. The parties have stipulated that both the State of Louisiana and the Registrar of Voters are subject to the prohibitions of the Voting Rights Act, 42 U.S.C. § 1973c.

*N.A.A.C.P. v. Hampton County Election Commission,* 470 U.S. 166, 105 S.Ct. 1128, 1130 n. 1, 84 L.Ed.2d 124 (1985) (quoting *McCain v. Lybrand,* 465 U.S. 236, 104 S.Ct. 1037, 1044, 79 L.Ed.2d 271 (1984).

By letter dated September 21, 1987, after this suit was filed, the Attorney General addressed

> "the alterations in the procedures and schedule for conducting the 1987 annual canvass and purge of registered voters in Wards 8 and 9 of the City of New Orleans in Orleans Parish, Louisiana...."

(Letter of Attorney General).

After reviewing the Registrar's submissions [6], the Attorney General affirmatively indicated that he "does not interpose any objections to the changes in question." *Id.* But plaintiffs could make additional submissions, if they wished. The Attorney General reserved

> "the right to reexamine this submission if additional information that would otherwise require an objection comes to his attention during the remainder of the sixty-day review period."

*Id.*

■ In view of the Attorney General's administrative determination, plaintiffs are not now entitled to injunctive relief. The Attorney General considered the submission, indicated that the alterations in question constitute "changes" within the meaning of Section 5, and granted preclearance. Although plaintiffs attack the propriety of the administrative determination [7], it is clear that such an administrative determination by the Attorney General is not judicially reviewable. *Morris v. Gressette,* 432 U.S. 491, 504–507, 97 S.Ct. 2411, 2420–2421, 53 L.Ed.2d 506 (1977). In *Morris,* the Court unequivocally insulated the administrative process from collateral attack:

> "... Congress intended to provide covered jurisdictions with an expeditious alter-

native to declaratory judgment actions.... Although there was to be no bar to subsequent constitutional challenges to the implemented legislation, there also was to be no dragging out of the extraordinary federal remedy beyond the period specified in the statute."

432 U.S. at 504, 97 S.Ct. at 2420. The *Morris* Court concluded that Congress "intended to preclude all judicial review of the Attorney General's exercise of discretion or failure to act." *Id.* at 507 n. 24, 97 S.Ct. at 2421 n. 24. Even if the decision of the Attorney General is erroneous, it is nevertheless a determination made pursuant to the Attorney General's Section 5 responsibilities and is nonreviewable. *Id.*

■ Plaintiffs urge that this three-judge Court nevertheless retains jurisdiction to determine whether the Registrar's failure to obtain preclearance prior to the implementation of the canvass and purge requires us to order some equitable remedy. *See N.A.A.C.P. v. Hampton County Election Commission,* 470 U.S. 166, 105 S.Ct. 1128, 84 L.Ed.2d 124 (1985). In *Hampton County,* the Supreme Court instructed the three-judge trial court to enter an order allowing the jurisdiction to submit certain changes to the Attorney General for approval. If the county failed to make the submission or the Attorney General interposed an objection, an election held pursuant to the change would be set aside. Even if the Attorney General did preclear the change after the fact, the Supreme Court instructed that:

> "[T]he District Court should determine, in the exercise of its equitable discretion, whether the results of the election may stand."

105 S.Ct. at 1138. The Court explained that the three-judge court had

> "never engaged in the equitable weighing process necessary to determine whether failure to submit a covered

---

**6.** Plaintiffs contest that the information sent to the Attorney General by the Registrar after this suit was filed constitutes a "submission" under the Act.

**7.** Plaintiffs concur with the Attorney General's finding that the Registrar's actions constitute "changes" under Section 5. However, plaintiffs

attack the Attorney General's ultimate determination on the grounds that the information submitted by the Registrar does not constitute a "submission" and that the Attorney General's decision comes before the expiration of the sixty day review period.

change for preclearance requires that an election be set aside. The factors to be weighed include 'the nature of the changes complained of, and whether it was reasonably clear at the time of the election that the changes were covered by § 5.' "

*Id.* at n. 36 (quoting *Perkins v. Matthews,* 400 U.S. 379, 396, 91 S.Ct. 431, 441, 27 L.Ed.2d 476 (1971)).

The Court believes that *Hampton County* presents a far different factual picture. That case involved an election held pursuant to a change in a statute which was never submitted to the Attorney General for preclearance. In *Hampton County,* the complained of conduct was never precleared. Here, it was.

Although this Court has the authority and power to engage in such an equitable weighing process and to order such relief as might be indicated, we are not satisfied that at the time of the canvass and purge it was "reasonably clear" within the meaning of *Hampton County* that the Registrar's actions constituted "changes" under Section 5 which must be additionally precleared. Plaintiffs charge that the Registrar deviated from the statutory requirement of conducting the annual canvass "in January." However, the record clearly indicates that the Registrar began the canvass process in January. The Registrar argues that that satisfies Section 192. The principal drafter of the statute testified in a state court proceeding, and would testify in this instance, that the "in January" language was added merely to serve as a directive to state registrars regarding the proper time to begin the canvass. Plaintiffs also urge that the Registrar failed to "immediately" notify those registrants whose canvass cards were returned by the post office. LSA–R.S. 18:193. Yet it cannot be said that it is reasonably clear that mailing the notices of irregularity on May 4, 1987, after completing processing of the returned canvass cards by April 15, 1987,

constitutes a "change" within the meaning of Section 5. Plaintiffs further claim that the Registrar failed to publish within the required five days from the mailing of the notices, a list of those voters subject to removal from the rolls. LSA–R.S. 18:193. However, the Registrar did publish such a list on May 7, 1987, well within the May 4, 1987 mailing. This publication was later deemed invalid by a state court, which issued a series of temporary restraining orders and preliminary injunctions and then vacated them. It was not until July 22, 1987, that the Registrar was effectively allowed to continue the cancellation procedure. On July 30, the Registrar mailed second notices of irregularity and, within 5 days, on August 3, 1987, the Registrar published the list in accordance with Revised Statute 18:193.

We do not decide whether the Registrar's conduct amounted to changes. Indeed, the Attorney General found that changes had occurred and we defer to that finding. But, under these circumstances, it is not at all clear to this Court, nor was it reasonably clear at the time of the canvass and purge, that the Registrar's actions constituted "changes" under Section 5 which require preclearance. Reasonable jurists can and do differ about what is a change. *See, e.g., Garcia v. Guerra,* 744 F.2d 1159, 1166 (5th Cir.1984) (Randall, J., concurring)[8]. The question we must address is whether the ·two threshhold tests of *Hampton County* are met under these facts so as to justify some equitable relief. Guided by the Supreme Court's instruction in *Hampton County,* this Court finds that equitable relief is not appropriate because it was not reasonably clear at the time that the Registrar's actions needed to be precleared.

■ But we do not stop our analysis at that point because plaintiffs' concern over the need for relief is unfounded. Plaintiffs propose an equitable remedy of allowing improperly purged registrants in Wards 8

---

**8.** Although Judge Randall concurred in the result reached by the panel in *Garcia,* she questioned the majority's finding that the holding of a special consolidation election in August rather than in April was a "change" from past practic-

es. In that case, the school districts had never before been the subject of a consolidation election. The election itself was a special election called by a county judge pursuant to statute.

and 9 to cast provisional ballots which would somehow be separated and not counted pending resolution of plaintiffs' Section 2 claim. However, there is no need for this extraordinary solution. State law adequately provides its own solution. Louisiana Revised Statute 18:562 explicitly anticipates the problem of the individual who is threatened with the possibility of not being allowed to vote for erroneous reasons, and, in fact, grants *more* relief than that sought by plaintiffs. Section 562 provides in pertinent part:

"Errors and omissions in voter records. If the registration certificate of a qualified voter was omitted from or incorrectly written on the precinct register or, in the parishes using the computer system, if the name of a qualified voter was omitted from or incorrectly written on the computer voting list, the commissioner shall:

(1) Contact the registrar of voters to ascertain whether or not the person applying to vote is registered to vote in that precinct.

(2) In the absence of a valid challenge of the voter, allow the voter to vote after he has made an affidavit before a commissioner attesting that he is a qualified registered voter and describing the error or omission in the voter records.

(3) Preserve the voter's affidavit as part of the election records by placing it in the envelope marked 'Put in Voting Machine.' "

LSA–R.S. 18:562.

Because broader remedial protection is already mandated by the Louisiana Election Code, plaintiffs' claim for equitable relief is unnecessary, even if it were warranted.[9]

Accordingly, for the foregoing reasons,

IT IS ORDERED:

Plaintiffs' Section 5 claim is dismissed.

McNAMARA, J., concurs.

ALVIN B. RUBIN, Circuit Judge, dissenting.

Whether or not it was reasonably clear that the Registrar's actions constituted a change in voting practices and procedures, the Attorney General has concluded that it did, and we accept that conclusion. The justification or lack of justification for the Registrar's failure to seek preclearance is now irrelevant to the question of the nature of the relief to which the plaintiffs are entitled by virtue of that failure.

This action was filed on August 18, 1987. In early September, at this court's suggestion, and in an equivocal manner, protesting that what they were sending the Attorney General was not truly a "submission," the defendants did, in fact, seek preclearance. Obviously, the court by its suggestion intended to accomplish the purposes of Section 5, and these purposes have now been accomplished, albeit with some considerable though unavoidable delays. It is now a scant week before the election, and the defendants have only recently furnished us with a statement of their interpretation of the requirements of Louisiana law for the conduct of the election and for permitting voters improperly purged from the rolls to cast their lawful ballots.

My brothers say that Louisiana law provides broad relief to the plaintiffs now seeking to remedy the injuries caused by the Registrar's delay in obtaining clearance. It was not clear to the plaintiffs, and it is not clear to me what Louisiana law

---

9. Plaintiffs identify potential problems with the remedial process. However, they point to possible complications which would arise in any election, whether or not a canvass and purge had been conducted. The affidavit the Registrar submitted in response to the Court's inquiry about the relief afforded under Louisiana law satisfies any concern of this Court that the Registrar interprets and will implement Section 562 in a way that will permit any person who was incorrectly purged to vote in the upcoming elections. We also note that State law requires that the election commissioners shall be trained in the use of voting machines and the duties of commissioners in conducting elections. Revised Statute 18:431(A). The commissioners "shall enforce the election laws", including Section 562. See Revised Statute 18:425(C). We believe, therefore, that the rights of incorrectly purged voters will be protected even beyond the scope of relief sought here. Nothing in this record suggests that the Louisiana Election Code will not be fully implemented.

requires because the exact procedures are not spelled out in any statute or published regulation. At the court's suggestion, made during oral argument, the Registrar, the Secretary of State, and the State Commissioner of Elections have submitted detailed descriptions of procedures that they say will be taken in compliance with Louisiana law. If these procedures are faithfully implemented, I would not order more. I would, however, now order that the procedures the defendants have proposed, a copy of which is attached, be incorporated in a court order so that both parties will have precise directions, the plaintiffs will have an opportunity to circulate the described procedures as widely as possible in an effort to minimize the effects of the delay they have hitherto suffered as a result of the Registrar's failure to obtain preclearance, and election day confusion can be held to a minimum.

### APPENDIX

#### Election Procedures

[I]n the primary election scheduled for October 24, 1987 and in the general election scheduled for November 21, 1987 with respect to voters canceled effective August 21, 1987, as a result of the Annual Canvass and Cancellation in accordance with LSA–R.S. 18:192 and 193, the Office of the Registrar of Voters ("Registrar") will follow [these] procedures ... [:]

(a) If a commissioner at a precinct within Wards 8 or 9 telephones Registrar, advising that a person has presented himself to vote in the election, but the name of that person is not included on the computer rolls of registered voters furnished to that ward and precinct by the Commissioner of Elections, then Registrar will receive, by telephone, the name of that person, that person's address and possibly other identifying information from the commissioner at that precinct.

(b) The staff of Registrar will take the information received by telephone from the poll commissioner and will query the official computerized voter registration terminals within the Office of Registrar to determine the status of that person as a current or previous registrant within that ward and precinct.

(c) If it is determined that the person was erroneously canceled effective August 21, 1987 as a result of the 1987 annual canvass and cancellation of ineligible registrants, and if that person executes an "Affidavit of Voter" in the same or similar form as that attached hereto and made a part hereof as Exhibit "A", and if that Affidavit is executed in the presence of the commissioner, and if that person has represented to the commissioner that he still resides at the same address as that reflected on his previous registration card (computer record) as of the date of cancellation (August 21, 1987), or if that person represented to the commissioner that he has moved within the *same ward and precinct* where he resided as reflected on his previous registration card (computer record) as of the date of cancellation (August 21, 1987), and if the address given by the person is, in fact, within the same ward and precinct, then Registrar or his authorized deputy[ies] will instruct the commissioner to allow that person to vote by way of the Affidavit procedure provided for by LSA–R.S. 18:562(B) ... and in accordance with the Opinion of the Attorney General dated October 28, 1986 (Opinion No. 86–716).... Before allowing a person to vote in accordance with this procedure, Registrar reserves the right to request information from such person for identification purposes. For example, the records of Registrar usually include date of birth, social security number, mother's maiden name and other information. If there is a question as to the identity of person seeking to vote, Registrar may request this information, by telephone or in person, from person seeking to vote whose name is not on the computer printout of registered voters sent to the polling places.

(d) Should a commissioner be unable, due to lack of telephone facilities or otherwise, to verify with Registrar the prior registration information of a person canceled effective August 21, 1987 or otherwise be unable to communicate to Registrar necessary information to accomplish the verifica-

tion of that person's eligibility to vote, that person presenting himself to vote may be instructed by the commissioner to present himself at the Office of the Registrar of Voters, Room 1W12, City Hall, where that person will be assisted by Staff of Registrar. Upon verification of his or her address, and the fact that he or she was erroneously canceled as a result of the 1987 Annual Canvass and Cancellation process, Registrar will instruct the person seeking to vote to return to the polling place for the precinct in Ward 8 or 9 in which they reside, and to have the commissioner contact Registrar who will then give telephonic instructions to the commissioner to allow that person to cast a vote in the election pursuant to the Affidavit procedure outlined in LSA–R.S. 18:562(B).

This procedure ... will apply only to those voters who have been canceled effective August 21, 1987 as a result of the 1987 annual canvass and cancellation of ineligible voters pursuant to LSA–R.S. 18:192 and 193. Therefore, this procedure shall apply only to Wards 8 and 9, the precincts of which were subject to canvass in 1987. In the event that a person presents himself to vote who has been canceled effective August 21, 1987 and that person has moved from the precinct in which he or she was previously registered to another precinct and has not corrected his address or re-registered, there is no provision for that person to vote on election day, and that person will not be approved by Registrar for voting under the aforementioned Affidavit procedure.

Registrar shall be open from 6:00 a.m. through 9:00 p.m. Registrar will be staffed with thirteen (13) employees, all of whom are qualified to assist commissioners with the identification of voters, the verification of addresses and related information, and to instruct commissioners whether or not to allow persons to vote in accordance with the Affidavit procedure.

On information and belief, the aforementioned policy and procedure are those required by the Election Code and the laws of the State of Louisiana, which procedure the Office of the Registrar will follow to the best of its ability. Although Registrar cannot guarantee the actions of commissioners or personnel of offices other than Registrar who may be involved in the process of Affidavit voting, Registrar and its staff will cooperate in every way possible to facilitate these procedures to the same extent that Registrar cooperates with the commissioners in all elections conducted within the Parish of Orleans.

Affidavit of A.E. Papale, Registrar of Voters for the Parish of Orleans, October 2, 1987.

\* \* \* \* \* \*

Exhibit "A"

## AFFIDAVIT OF VOTER

STATE OF LOUISIANA DATE: _____

PARISH OF _____
WARD OR DISTRICT NO. _____
PRECINCT NO. _____

 BEFORE ME, the undersigned commissioner, personally came and appeared _____, who, after being duly sworn, did depose and say that: He(she) is a qualified voter in the above named ward or district and precinct; that his(her) name was: (check applicable block below)

1. ☐ omitted from the precinct register or computer list.
2. ☐ incorrectly written on the precinct register or computer list.

_____ _____
Signature of voter Address of voter

 _____
 Signature of commissioner
 (R.S. 18:562B. (2))

Prepared and Furnished by
JAMES H. "Jim" BROWN
Secretary of State

 _____

 * * * * * *

 For the Primary Election scheduled for October 24, 1987 and the General Election scheduled for November 21, 1987, each precinct is provided with ten (10) blank forms.

 Additionally, the Clerk of Court for the Criminal District Court for the Parish of Orleans, who is the authority charged with providing additional material, if needed, on election day, will be provided an additional two thousand, five hundred (2,500) copies of the blank form of affidavit described above.

Affidavit of Darrell L. Cobb, Administrator of Commissions, Elections and Publications, for the Office of the Secretary of State, October 2, 1987.

 * * * * * *

 The policy of [the Department of Elections and Registration] concerning voting by people whose names do not appear on the computer list at the voting poll is found in the Election Code, Title 18 of Louisiana Revised Statutes. Additionally, [the Department] relies on Louisiana Attorney General Opinion No. 86–716, dated October 28, 1986 as the statement of policy concerning voters whose names are not on the voting list and who have not changed addresses.

 Pursuant to Louisiana Revised Statutes 18:562(B), the Registrar has the authority to determine that the person applying to vote is a qualified registered voter in the precinct where he is applying to vote.

 Further, state law requires that Commissioners be trained according to state law.

 When a person appears at a polling place and that person's name does not appear on the roll, the commissioner is required to contact the Office of the Registrar in order for the Registrar's Office to determine whether or not a mistake has been made as to the registration of that person. If and only if the Registrar or his deputy gives approval, then the commissioner is required to provide an affidavit form that has been filled out to include Ward and Precinct Number and Voter's Name to the person wishing to vote. The person is required to mark the reason his name was not on the rolls and to sign the affidavit. The commissioner is required to then sign the affidavit, and the person is then allowed to vote and the affidavit is kept in the appropriate file with the voting machine. If the

Registrar or his deputy does not give approval, then the person will not be allowed to vote.

If the commissioner is unable, due to lack of telephone facilities or otherwise, to contact the Registrar's Office, the commissioner shall require the person to appear personally before the Registrar in order to confirm the status of the person wishing to vote. If and only if the Registrar or his deputy provides approval, then the above described affidavit procedure will continue as soon as the person returns to the polling place.

Affidavit of Elsie Cangelosi, Executive Officer in the Department of Elections and Registration, October 2, 1987.