**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jeffrey Allen KOONCE, Defendant–Appellant.**

**No. 92–2853**
**Non–Argument Calendar.**

United States Court of Appeals, Eleventh Circuit.

May 25, 1993.

Kim K. Seavey, Tampa, FL, for appellant.

Kevin Darken, and Tamra Phipps, Asst. U.S. Attys., Tampa, FL, for appellee.

Before TJOFLAT, Chief Judge, BLACK and CARNES, Circuit Judges.

CARNES, Circuit Judge:

This case arose from Appellant Jeffrey Koonce's use of a BB gun to rob a post office. His appeal presents two questions. One involves a Sentencing Guidelines issue of first impression stemming from the type of weapon used, and the other involves a restitution issue under the Victim and Witness Protection Act.

### FACTS

Armed with a BB gun pistol he had received as a gift from his former girlfriend's mother, Jeffrey Koonce robbed the post office in Morris Chapel, Tennessee (Pop. 2,651). On that occasion, the physical embodiment of federal authority in Morris Chapel was manned by a woman, Bonnie Perkins, the local postmaster. To the frightened Ms. Perkins the pistol Koonce brandished appeared to be the real thing, and she felt herself in no position to resist

his demand that she turn over all of the cash on the premises. She did so, giving Koonce the entire $14.43. Apparently realizing that the United States Government and its instrumentalities printed money in more ways than one, Koonce also demanded and received a money order imprinter and blank money orders to go with it.

Koonce then admonished Ms. Perkins to "Have a nice day," and left the scene in a pickup truck which he had borrowed from a car lot in another town for a test drive. To make his getaway Koonce drove down Coffee Bottom Road, onto a dirt road, and then onto an old logging road where he rendezvoused with his uncle who was waiting for him in a seven-year-old silver Mustang. The two men rode their Mustang over back roads and into Florida where they intended to have what may be known in Western Tennessee, and perhaps elsewhere, as a good time.

During one eventful week in the Sunshine State, the two men printed and spent $7,150.00 in money orders. Apparently dissatisfied with the style of travel in their Mustang, they spent a total of $1,650.00 in money orders on two limousine services, including over a thousand dollars at an establishment called "Personal Touch Limousines." They also spent almost a thousand dollars in money orders at a tavern and a lounge. As Koonce put it in his confession, they "spent a lot of money on booze and food." The remainder of the money orders were cashed and the money spent in a similar vein, some of it at establishments referred to in the record as "dance clubs." In this type of club, it is not the patrons who do the dancing.

One such "club" is the "2001 Tampa Odyssey" lounge where Koonce was apparently impressed with the professional attributes of an exotic dancer whose stage name is Holly. He offered to and did give her a $650.00 money order in return for having sex with him, which she did at the Motel Six next to the lounge. She paid for the room herself. When the transaction was completed, Koonce was picked up at the Motel Six by his uncle and a limousine driver in the style to which he had become accustomed.

The next day Holly and her boyfriend Dan tried to cash the money order at a check cashing service, but an alert clerk noticed that it had been filled out incorrectly. There is nothing in the record to explain why Koonce had committed an error on that particular money order, out of all of them, but it is tempting to infer that he might have been in a hurry to get it printed. Whatever the explanation for the error, the suspicious clerk notified postal inspectors who questioned Holly and Dan about the origin of the money order. Apparently unwilling to turn the other cheek, Holly gave authorities Koonce's name and probable whereabouts. It is not difficult to spot or follow a chauffeured suspect, and that same day Koonce was observed in the lounge parking lot in a limousine. After following Koonce for a while, the authorities arrested him as he left a check cashing establishment, thereby ending his seven-day odyssey in Florida.

## PROCEDURAL FACTS

After he was arrested and had confessed, a grand jury in the Western District of Tennessee indicted Koonce for armed robbery of a post office in violation of 18 U.S.C. § 2114. He was also charged in Florida with passing stolen money orders, but those charges were dropped in exchange for his guilty plea to the post office robbery indictment. The guilty plea to the Tennessee indictment was taken in the Middle District of Florida pursuant to Fed. R.Crim.P. 20(a).

At the sentencing hearing, Koonce proffered evidence that the pistol used was only a BB gun that looked like a real pistol, and the Government proffered evidence that the postmaster to whom it was brandished certainly thought that it was a real pistol. Koonce had thrown the gun out the window during the trip south, and it was never recovered. The district court accepted both proffers and found that Koonce in reality had used a BB pistol, but that the postmaster reasonably believed that it was a real firearm. Over Koonce's objection,

the court calculated his sentence with a five-level enhancement from the base offense level for brandishment of a firearm instead of only enhancing it three levels for brandishment of a dangerous weapon, which the Guidelines define a BB gun to be. After all was said and done, Koonce ended up with a total offense level of twenty-six to go with his criminal history category of V, which netted him a sentence range of 110 to 137 months. The court sentenced Koonce to 110 months imprisonment, the low end of the range, and it did so at least in part because the weapon he used was only a BB gun. If the district court had given Koonce a three-step enhancement for brandishing the BB gun instead of a five-step enhancement, Koonce would have ended up with a total offense level of twenty-four to go with his criminal history category of V, which would have netted a sentence range of 92 to 115 months.

The other issue in contention at the sentencing hearing concerned restitution. The district court ordered Koonce to pay restitution not only to the Morris Chapel Post Office for the cash stolen, but also to eight establishments and one individual who had given cash, goods, or services to Koonce and his uncle in exchange for the money orders. That one individual for whom restitution was ordered was not the hapless Holly, the exotic dancer who accepted a money order from Koonce for services rendered at the Motel Six. An unsympathetic probation officer concluded that even though she "has a loss of $650.00, the services she provided Mr. Koonce for that money were illegal," therefore, she "is not considered a victim in this case, nor is she owed any restitution." The district court obviously agreed, because it failed to order Koonce to pay her any restitution, not even to cover her out-of-pocket expenses for the motel room. Ironically, Koonce's brief lists Holly (albeit under her more prosaic real name) in the certificate of interested parties and describes her as a "victim." The Government does not. Neither side has addressed in its brief whether the district court erred in failing to order restitution for her, and she is not a party. Based upon these bare procedural facts, the issue of whether Holly the exotic dancer should have been granted restitution is not presented for review.

Another restitution issue is before us. The eight establishments and one individual to whom restitution was ordered had been forced to repay the post office for the amount of the money orders. Koonce was essentially ordered to pay them back for paying back the post office. Koonce concedes that restitution was properly ordered for the cash he took from the Morris Chapel Post Office, but he contended in the district court and argues before this Court that it was improper to order restitution to the other establishments and the one individual, because they were not victims of the robbery per se, the only crime for which he was convicted.

## DISCUSSION

### The Sentencing Guidelines Enhancement Issue

The issue squarely presented by the facts of this case is how to treat for robbery offense level enhancement purposes an object that appears to be a firearm but in reality is merely a dangerous instrument, as those terms are currently defined in the Sentencing Guidelines. This issue is one of first impression, due in large part to the fact that until a November 1, 1991 amendment to the Guidelines, brandishing a firearm and brandishing a dangerous weapon were treated the same. Old U.S.S.G. § 2B3.1(b)(2)(C) provided that a robbery defendant who had brandished, displayed, or possessed "a firearm or other dangerous weapon" received an enhancement of three offense levels.

The amendment distinguished between firearms and dangerous weapons. Under the amended version of the Guidelines, applicable to this case, the two types of weapons are treated differently. Guideline provisions in effect now and at the time of sentencing provide that a robbery defendant who "brandished, displayed, or possessed" a firearm is to have his base offense level increased by five levels.

U.S.S.G. § 2B3.1(b)(2)(C). If the object "brandished, displayed, or possessed" is a dangerous weapon instead of a firearm, then the enhancement is three levels, not five. *Id.* § 2B3.1(b)(2)(E).[1]

Supporting Koonce's position that a BB gun is a dangerous weapon and not a firearm is this seemingly straightforward definition of firearm:

> "Firearm" means (i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (ii) the frame or receiver of any such weapon; (iii) any firearm muffler or silencer; or (iv) any destructive device. *A weapon, commonly known as a "BB" or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm.*

*Id.* § 1B1.1, comment. (n. 1(e)) (emphasis added). That seems simple enough.

The Government argues, and the district court found, however, that the victim in this case quite reasonably thought that the pistol was the real thing, a firearm. Koonce cannot question the reasonableness of such a perception, because he confessed that he had used "a BB gun of mine that looks like a real gun, somewhat like a 45 automatic." Koonce's contention is that reality, and not appearance, is the criterion insofar as the Guidelines' definition of firearms is concerned. The strongest support for his position arises from the fact that commentary to the Guidelines expressly provides that insofar as dangerous weapons are concerned, appearances count as well as reality; but no such provision is made concerning firearms. The same application note that gives the definition of "firearm" quoted above also contains in another subpart this definition:

> "Dangerous weapon" means an instrument capable of inflicting death or serious bodily injury. *Where an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon.*

*Id.* comment. (n. 1(d)) (emphasis added).

That is not all. The commentary says the same thing again in a second place. The second application note to the robbery offense level section of the Guidelines, U.S.S.G. § 2B3.1, plainly states:

> When an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon for the purposes of subsection (b)(2)(E).

Subsection (b)(2)(E) is the provision for a three-level increase in the offense level where a dangerous weapon was brandished, displayed, or possessed. By contrast, there is no provision that an object that appeared to be a firearm should be treated as a firearm for purposes of a five-level increase under § 2B3.1(b)(2)(C).

The district court stated no rationale for treating the BB gun as a real firearm except to state its conclusion that, "Thinking that it was real equates it with being a firearm that could do her harm and therefore five levels are appropriate in this situation." Under the Guidelines and their commentary, that would be true insofar as

---

1. The three decisions Koonce relies upon in his brief, *United States v. Pool,* 937 F.2d 1528 (10th Cir.1991), *United States v. Faulkner,* 934 F.2d 190 (9th Cir.), *as amended on denial of rehearing,* 952 F.2d 1066 (1991), and *United States v. Benson,* 918 F.2d 1 (1st Cir.1990), are not helpful. None of those decisions tells us whether, under the distinction the present version of the Guidelines makes, objects that appear to be but are not firearms are to be treated as firearms or as dangerous weapons.

This Court's recent decision in *United States v. Shores,* 966 F.2d 1383, 1387–88 (11th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 353, 121 L.Ed.2d 268 (1992), is not dispositive of this case for the same reason. *Shores* affirmed a three-step enhancement for use of a toy gun that appeared to be a dangerous weapon. The pre-amendment Guidelines applicable in that case, however, made no distinction between firearms and dangerous weapons; the same three-step increase was provided for any "dangerous weapon (including a firearm)." Moreover, *Shores* focused solely upon the issue of whether possession without display of the object was sufficient to warrant enhancement. Whether an object that looks like a firearm is to be treated as a firearm, instead of as a dangerous weapon, was not relevant to disposition of that case under the Guidelines then in effect and it was not discussed.

a three-step increase for dangerous weapons is concerned, but it is at least impliedly not true with look-alike firearms and a five-step enhancement.

The Government contends that, "the only support for defendant's argument that victim perception is irrelevant is the application note's silence on the issue," and says, "[t]hat silence is only conspicuous because the analogous dangerous weapon application note expressly addresses victim perception." That may be true, but merely describing the argument does not rebut it. Conspicuously absent from the Government's brief is any credible explanation for why the Sentencing Commission, if it intended victim perception to control over reality for firearms enhancement, would not have said so as it did twice for dangerous weapon enhancement.

■ From that which is and that which is not in the commentary, we conclude that if the Sentencing Commission had intended to have appearances count over reality for "firearm" definition purposes it would have said so, as it did for "dangerous weapon" definition purposes. The canon of statutory construction that the inclusion of one implies the exclusion of others is well-established. *See, e.g., Gozlon–Peretz v. United States*, 498 U.S. 395, 403–404, 111 S.Ct. 840, 846–47, 112 L.Ed.2d 919 (1991); *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *United States v. Giltner*, 972 F.2d 1563, 1565 (11th Cir.1992); *United States v. Jordan*, 915 F.2d 622, 628 (11th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1629, 113 L.Ed.2d 725 (1991). The popularity of that canon with courts stems from more than the fact that it dresses well in Latin: *inclusio unius est exclusio alterius*. The canon is frequently cited and employed because in many circumstances it makes good sense. This case is a prime example.

■ We hold that a BB gun that looks like a real firearm and is perceived by the victim of a robbery to be such is not a firearm for purposes of the five-step enhancement of the base offense level for robbery under U.S.S.G. § 2B3.1(b)(2)(C). It is a dangerous weapon which leads to a three-step enhancement under § 2B3.1(b)(2)(E). Koonce is due to be re-sentenced accordingly, which will result in a lower Guidelines range.

Because the sentence Koonce received (110 months) is within the new sentence range (92 to 115 months), the district court on remand may reach the same final result as before. That possibility does not remove the need for a remand, because it is also possible that the court may exercise its discretion to reach a different result. Our cases consistently hold that however they ultimately exercise their discretion, district courts must correctly perceive the range of that discretion before deciding whether or how to exercise it. *See e.g. United States v. Fairman*, 947 F.2d 1479, 1480–81 (11th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1503, 117 L.Ed.2d 642 (1992); *United States v. Fossett*, 881 F.2d 976, 979 (11th Cir.1989).[2]

### The Restitution Issue

■ The Victim and Witness Protection Act (the "Act") provides that when a district court sentences a defendant, it may order "that the defendant make restitution to any victim of the offense." 18 U.S.C. § 3663(a)(1). Koonce does not contest the district court's order that he pay restitution to the United States Post Office in Morris Chapel for the stolen cash, but he contends that restitution should not have been ordered to those businesses and the one individual who parted with goods, cash, or services in return for the money orders. Koonce's argument is that "the offense" referred to in § 3663(a)(1) of the statute is

---

2. It should not be inferred that the district court treated Koonce in less than a courteous manner, because the record shows not only courtesy but also genuine concern on the part of the court. Koonce has a history of non-violent offenses. After sentencing him in this case, the court counselled: "Sir, I wish you well in the future,

get this behind you.... You just don't need to add to it when you come on out, don't add to it or they'll warehouse you for the rest of your life." Koonce responded by promising "this is the last time," and the court replied: "Take care of yourself, sir, you're excused."

the offense for which he was convicted, the robbery. Because he was not convicted of any offense involving printing or passing the money orders, Koonce maintains that the district court lacked the authority to order restitution to the victims of that additional criminal activity.

Koonce relies upon *Hughey v. United States,* 495 U.S. 411, 413, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408 (1990), which held that "the language and structure of the Act make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." (footnote omitted). More specifically, the Supreme Court held that a district court was not authorized to order a defendant to pay restitution for losses incurred by victims of his fraudulent use of sixteen credit cards where he had been convicted for use of only one of those cards. *Hughey* was followed by this Court in *United States v. Epperson,* 938 F.2d 1230, 1231 (11th Cir. 1991).

The Government counters that this case is distinguishable from *Hughey,* and thus *Epperson,* because when the establishments and the individual exchanged goods, services, and cash for the stolen money orders in this case they became victims, at least indirectly, of the offense of conviction—the robbery of money orders from the post office. The Government relies upon pre-*Hughey* cases, such as *United States v. Hairston,* 888 F.2d 1349, 1355 (11th Cir.1989). We need not delve further into the Government's indirect victim argument, because there is a clear statutory basis for the restitution order in this case.

In this case, unlike *Hughey,* the other victims to whom restitution was awarded were themselves required to compensate the postal service for allowing Koonce to convert the money orders into cash, goods, and services. The Government has represented in the district court and again before this Court, without any dispute, that all of the non-post office victims to whom

Koonce was ordered to pay restitution have themselves already reimbursed the postal service for losses resulting from the money orders which were taken in the robbery and later passed. That fact is dispositive, because the Act provides:

> The court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation, except that *the court may, in the interest of justice, order restitution to any person who has compensated the victim for such loss to the extent that such person paid the compensation.* An order of restitution shall require that all restitution to victims under such order be made before any restitution to any other person under such order is made.

18 U.S.C. § 3663(e)(1) (emphasis added). No similar facts were involved in *Hughey,* therefore, that decision does not purport to limit the application of the plain words of § 3663(e)(1). Because of Koonce's robbery of the post office during which he stole money orders, the Postal Service suffered a loss of those money orders for which it has received compensation from eight establishments and one individual. Under the plain words of the Act, the district court could, as it did, order, "in the interest of justice," that Koonce pay restitution to them to the extent of the compensation they had paid to the Postal Service.[3]

## CONCLUSION

We AFFIRM the district court's restitution order. We REVERSE the sentence and REMAND the case for further sentencing proceedings in accordance with this opinion.

---

**3.** Because we dispose of this issue on the basis of § 3663(e)(1), we have no occasion to address whether the 1990 amendment to § 3663(a)(2), which expanded the definition of "victim," also supports our conclusion.