Avery L. WARD, et al., Plaintiffs,

v.

State of ALABAMA, et al., Defendants.

The United States of America, Plaintiff,

v.

State of Alabama, et al., Defendants.

Nos. Civ.A. 98–D–1156–N,
Civ.A. 98–T–1181–N.

United States District Court,
M.D. Alabama,
Northern Division.

Dec. 17, 1998.

James U. Blacksher, Birmingham, AL, Marvin H. Campbell, Montgomery, AL, J. Gerald Hebert, Alexandria, VA, Edward Still, Lawyers' Committee for plaintiffs.

Janet Reno, Elizabeth Johnson, U.S. Department of Justice, Civil Rights Division, Washington, DC, Redding Pitt, U.S. Attorney, U.S. Attorney's Office, Montgomery, AL, Bill Lann Lee, U.S. Department of Justice, Civil Rights Division, Housing & Civil Enforcement Section, Washington, DC, for The United States of America, consolidated plaintiff.

Before EDWARD E. CARNES, Circuit Judge, MYRON H. THOMPSON, District Judge, and IRA DE MENT, District Judge.

### MEMORANDUM OPINION

CARNES, Circuit Judge.

This is a section 5 preclearance case, *see* 42 U.S.C. § 1973c, involving a 1996 amendment to Alabama's absentee voting laws. The provision in question, which is contained in section 3 of Act No. 96–885, now codified as Ala.Code § 17–10–5(a) (Michie Supp.1997), changed the law so that absentee ballots could no longer be mailed to the address where a voter regularly receives mail, if it is different from the voter's residence address.

After conducting a hearing, on October 21, 1998, we issued an order holding that, contrary to the contentions of Alabama officials, this particular change in the state's voting laws had not been precleared by the Attorney General of the United States. We also held that as a result, the change could not be implemented until precleared by the Attorney General or by the United States District Court for the District of Columbia, as provided in 42 U.S.C. § 1973c. We issue this opinion to explain the basis for our prior order.

## I. BACKGROUND AND PROCEDURAL HISTORY

Following a heightened degree of public concern about absentee voting fraud arising out of the elections of 1994, the Alabama Legislature passed Act No. 96–885, which was signed into law by the Governor on August 2, 1996. The Act revised the procedures for absentee voting in a number of ways. Only one of the revisions is at issue in this proceeding, and that is the one which amended Ala.Code § 17–10–5. Prior to its amendment, under that code section delivery of an absentee ballot could be made "by (1) forwarding it by United States mail to the applicant's or voter's residence address *or the address where the voter regularly receives mail* or (2) by handing the absentee ballot to the voter or, in the case of emergency voting, his or her designee in person" (emphasis added). Section 3 of the Act deleted the underscored words. The result of eliminating the alternative of delivery to "the address where the voter regularly receives mail" is to prevent those who receive their mail at some address other than their residence from receiving absentee ballots by mail.

As the Attorney General of Alabama subsequently noted in a June 19, 1997, advisory opinion discussing the amendment, the Act would not affect the delivery of absentee ballots to military personnel or their spouses or dependents.[1] They could continue to receive absentee ballots at their active duty addresses or their residence addresses. But other voters would be affected by the provision. For example, as the Alabama Attorney General advised, a college student who had not affirmatively established her college residence as her new address and changed her voter registration could no longer have election officials mail an absentee ballot to her at college.

This change in the law would have had a significant impact on a substantial number of Alabamians, many of them residents of smaller rural communities across the State. In approximately 373 locations in the State of Alabama, the United States Postal Service will not deliver mail directly to homes. Residents of these communities must retrieve their mail from the post office, receiving it

---

1. *United States v. Alabama,* civil action no. 98–T–1181–N, memorandum in support of United States' motion for a temporary restraining order and preliminary injunction, filed October 19, 1998, Attachment A at 4–5 (Alabama Attorney General Opinion No. 97–00209 (June 19, 1997)).

either General Delivery or in a rented post office box.[2] Because they cannot receive mail at their "residence address," voters in these communities would no longer receive absentee ballots by mail.

On August 5, 1996, the State submitted Act No. 98–885 to the Attorney General of the United States for preclearance pursuant to § 5 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973c.[3] In its five-page submission letter, the State provided commendably detailed descriptions of amendments made by the Act to Ala.Code §§ 17–10–3 and 17–10–7. Significantly, however, the submission letter made no mention at all of § 17–10–5, nor did it indicate any desire to have any amendment to that section precleared. The submission letter did refer to an enclosed "redlined" copy of the Act, with deletions from the former language of the statute indicated by struck-through text and additions marked by underlined text. A copy of the pre-amendment legislation was also included, as were a number of newspaper articles discussing the Act.

On October 7, 1996, the Department of Justice requested further information from the State. The request included queries about provisions other than the two sections specifically referred to in the State's submission letter, but not about any change to § 17–10–5. The Justice Department's letter included a request for "a discussion of whether the proposed changes are expected to reduce the number of persons casting absentee ballots in any Alabama county." On December 5, 1996, the State provided a lengthy response, which noted that absentee voters "may still apply for and cast an absentee ballot by mail or at the absentee election manager's office, as now provided by law." The State's response did not refer to or discuss the amendment to § 17–10–5, which restricted the delivery of absentee ballots by mail.

With the additional information in hand, the Department of Justice issued a letter on February 4, 1997, preclearing the "specified changes," along with further additional changes that had been noted by the Attorney General in the course of reviewing the State's submission.[4] None of the changes mentioned in the preclearance letter involved any part of § 17–10–5(a).

The plaintiffs in these actions claim that the State failed to obtain preclearance for the Act's amendment of the absentee ballot mail delivery provision, now § 17–10–5(a). The plaintiffs in the first case, *Ward v. State of Alabama*, civil action no. 98–D–1156–N, are five residents of Five Points, Alabama, suing for themselves and on behalf of other registered voters in the State of Alabama who lack residential mail service.[5] The Attorney General, on behalf of the United States, is the plaintiff in the second action, *United States v. State of Alabama*, civil action no. 98–T–1181–N. This three-judge district court panel was convened to hear the consolidated actions. *See* 42 U.S.C.A. §§ 1973c, j(d); *Allen v. State Board of Elections*, 393 U.S. 544, 555–58, 89 S.Ct. 817, 826–27, 22 L.Ed.2d 1 (1969).

## II. DISCUSSION

### A.

Under § 5 of the Voting Rights Act of 1965, the State of Alabama must submit for the approval of the federal government "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force and effect on November 1, 1964." *See* 42 U.S.C.A. § 1973c. The State may preclear a voting change in one of two ways. It may obtain a declaratory judgment in the United States District Court for the District of Columbia, or it may submit the change to

---

**2.** *Ward v. Alabama*, civil action no. 98–D–1156–N, complaint ¶ 12.

**3.** *Ward v. Alabama*, civil action no. 98–D–1156–N, brief of the State of Alabama, James Bennett, and Charles W. Story in opposition to section 5 claims, filed October 20, 1998, at 1.

**4.** *United States v. Alabama*, civil action no. 98–T–1181–N, memorandum in support of United States' motion for a temporary restraining order and preliminary injunction, filed October 19, 1998, Attachment C.

**5.** *Ward v. Alabama*, civil action no. 98–D–1156–N, complaint ¶ 12.

the Attorney General for approval. If the Attorney General approves the change, or fails to register an objection to the change within 60 days, the change is precleared.[6] *See id.* "No new voting practice is enforceable unless the covered jurisdiction has succeeded in obtaining preclearance." *Lopez v. Monterey County,* 519 U.S. 9, 117 S.Ct. 340, 347, 136 L.Ed.2d 273 (1996).

■ Both the Attorney General and private litigants may ensure a State's compliance with the preclearance provisions of the Voting Rights Act by bringing an enforcement action before a three-judge district court panel. *See* 42 U.S.C.A. § 1973c, j(d); *Allen,* 393 U.S. at 555–58, 89 S.Ct. at 826–27. Because Congress has reserved for consideration by the Attorney General or the District Court for the District of Columbia the duty to determine whether a change covered by the Voting Rights Act has the purpose or effect of "denying or abridging the right to vote on account of race or color," *see* 42 U.S.C.A. § 1973c, our own inquiry is necessarily a limited one. *See Allen,* 393 U.S. at 555–56, 89 S.Ct. at 826; *Perkins v. Matthews,* 400 U.S. 379, 383–85, 91 S.Ct. 431, 434–35, 27 L.Ed.2d 476 (1971). We do not inquire into the discriminatory purpose or effect of a change. We ask only "(I) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy [is] appropriate." *See City of Lockhart v. United States,* 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 1001 n. 3, 74 L.Ed.2d 863 (1983). Here, there is no dispute that the amendment to § 17–10–5 is a covered change under the Voting Rights Act of 1965; the State concedes it is. Nor is there any dispute as to the proper remedy absent preclearance. Instead, the only dispute is about whether the Attorney General precleared the change.

### B.

■ The State of Alabama contends that it obtained preclearance of Act No. 96–885, including the change in the absentee ballot mailing provision at issue here, when the Attorney General issued her letter of February 4, 1997, declining to interpose any objection to the "specified changes." We disagree.

■ It has long been the law that in order to successfully obtain preclearance of a voting change from the Attorney General, the State submitting the change must "in some *unambiguous* and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the [Voting Rights] Act." *See Allen,* 393 U.S. at 571, 89 S.Ct. at 834–35 (emphasis added). The State must clearly identify the changes it is submitting for preclearance by the Attorney General. This requirement helps ease the burden on the Attorney General, who each year must carefully review thousands of electoral changes. *See Clark v. Roemer,* 500 U.S. 646, 658–59, 111 S.Ct. 2096, 2104, 114 L.Ed.2d 691 (1991). The requirement of clear identification also recognizes that a State may decide to leave some part of a statute affecting voting unenforced, whether due to an independent determination that the provision violates the Voting Rights Act, a conclusion that it conflicts with other state law, or for some other reason. *See, e.g., McCain v. Lybrand,* 465 U.S. 236, 256 n. 28, 104 S.Ct. 1037, 1049 n. 28, 79 L.Ed.2d 271 (1984) ("There is an analytical distinction between two questions: whether a particular electoral provision was subject to § 5 preclearance, and whether it was actually submitted for preclearance on a particular occasion. Even though a number of the elements of an electoral scheme are subject to preclearance and should be submitted, only some of those features may actually be submitted for review."). Without an unambiguous identification of the changes being submitted for preclearance, the Attorney General would have no clear idea of what she was being asked to do.

---

6. The Attorney General may extend the 60–day period, and did so in this case. *See* 28 C.F.R. § 51.37(c). The State contends that the Attorney General affirmatively approved the amendment to § 17–10–5 by its letter of February 4, 1997, not by the failure to respond earlier, so no issue of timing is presented in this case.

■ Because the burden is on the State to submit an "unambiguous description of proposed changes," *see Young v. Fordice,* 520 U.S. 273, ——, 117 S.Ct. 1228, 1237, 137 L.Ed.2d 448 (1997) (summarizing *McCain*), courts apply a "presumption that 'any ambiguity in the scope of the preclearance request' must be construed against the submitting jurisdiction." *Clark,* 500 U.S. at 659, 111 S.Ct. at 2105 (*quoting McCain,* 465 U.S. at 257, 104 S.Ct. at 1050). That presumption is determinative in this case, because the State's submission did not unambiguously identify the change in § 17–10–5 as one being submitted.

The State makes three principal points in favor of its assertion that the change in § 17–10–5 was precleared by the Attorney General. First, it argues that the redlined version of the Act, which formed part of its initial submission to the Attorney General on August 5, 1996, made all changes "readily apparent on the face of the documents provided," *see* 28 C.F.R. § 51.27(c), and so the amendment to § 17–10–5 need not have been called to the attention of the Attorney General any more specifically.[7]

It is true that the change in the language of the absentee ballot mailing provision is apparent from an examination of the version of the Act submitted by the State of Alabama, which reflected all changes to existing code provisions with underlines or strikethroughs. Had the State clearly stated in its submission letter that all changes indicated on the face of the enclosed redlined version of the Act should be treated as voting changes submitted for preclearance by the Attorney General, that might satisfy the requirement that the proposed changes be clearly identified. We need not reach that

question here, however, because the State's submission letter said nothing of the kind. The submission letter simply stated that "[a] copy of Act No. 96–885 is enclosed."[8] It then proceeded to discuss, in some detail, *specific* changes to the State's absentee voting procedures, but did not mention the change at issue before us.[9]

■ A well-established canon of statutory construction provides that the inclusion of one implies the exclusion of others. *See, e.g., O'Melveny & Myers v. Federal Deposit Insurance Corp.,* 512 U.S. 79, 86, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994) ("Inclusio unius, exclusio alterius ."); *United States v. Koonce,* 991 F.2d 693, 698 (11th Cir.1993) ("The canon of statutory construction that the inclusion of one implies the exclusion of others is well-established."). That "canon is frequently cited and employed because in many circumstances it makes good sense." 991 F.2d at 698. The canon also makes good sense in construing submission requests such as the one before us. By specifying that certain changes were submitted for preclearance, the State's submission letter implied that other changes were not. At a minimum, it created an ambiguity, and ambiguities must be resolved against the submitting authority. *See Clark,* 500 U.S. at 659, 111 S.Ct. at 2105 (*quoting McCain,* 465 U.S. at 257, 104 S.Ct. at 1050). The State also failed to discuss the amendment to § 17–10–5 in its clarifying letter of December 5, 1996, which went into further detail about the background of the Act and the effect of its revisions. That failure only deepened the ambiguity.

Nor can we conclude that the changes to § 17–10–5 are "readily apparent on the face

---

7. *Ward v. Alabama,* civil action no. 98–D–1156–N, brief of the State of Alabama, James Bennett, and Charles W. Story in opposition to section 5 claims, filed October 20, 1998, at 4–5.

8. There is no suggestion that state officials making the submission prepared the "redlined" copy of Act No. 96–885 in order to indicate the provisions being submitted for preclearance. Instead, the rules of the Alabama Legislature require that amendatory legislation be prepared in red-lined form. *See Rules of the House of Representatives of the State of Alabama* 12(a)(1) (1997) ("No bill amending an existing statute shall be accepted

for introduction in the Legislature unless: (1) the language to be deleted is stricken through . . . and (2) the language to be inserted is underscored. . . ."); *Rules of the Senate of the State of Alabama* 12(a)(1) (1995). The copy of the Act in the submission enclosures was simply the legislation in the form in which it was enacted.

9. *United States v. Alabama,* civil action no. 98–T–1181–N, memorandum in support of United States' motion for a temporary restraining order and preliminary injunction, filed October 19, 1998, Attachment B.

of the document[ ]" in this case, *see* 28 C.F.R. § 51.27(c), given the inconsistency between the numerous changes indicated by the red-lined version of the Act and the limited number of changes specified in the State's submission letter. As we stated earlier, a distinction must be drawn between electoral provisions that are *subject* to preclearance, and those that are *actually submitted* for preclearance. *See McCain*, 465 U.S. at 256 n. 28, 104 S.Ct. at 1049 n. 28.

The State's second argument, closely related to its first, fails on the same grounds. The State contends that the amendment to the absentee ballot delivery provision was specifically identified in the voluminous exhibits provided by the State in support of its submission.[10] Those exhibits included several hundred pages of newspaper and magazine articles, transcripts of testimony, and other materials discussing the mischief addressed by the Act, as well as the passage of the Act itself. A newspaper article in the exhibits does note that one effect of the 1996 amendments is to "[r]equire[ ] that absentee ballots be sent to the residence of the applicant." The problem with the State's contention is that the voluminous exhibits it submitted discuss numerous voting changes effected by the Act, some of which were identified in the submission letter itself and some of which were not. Nowhere in the submission letter, however, did the State refer to specific exhibits as expanding the list of changes it was submitting for preclearance. Thus the exhibits did nothing to clarify the ambiguity in the submission documents.

The State notes that in 1994, when it sought preclearance for an earlier set of revisions of Alabama election laws, it referred to secondary materials to indicate to the Attorney General the specific changes it was submitting for preclearance, and the Department of Justice has never suggested those changes were not precleared.[11] But in that case, the State's submission letter stated: "An excellent and informative description of Act No. 94–320 and the changes it makes in the current absentee voting laws is found on page 2 of the May 1994 newsletter of the Alabama Secretary of State's office. This newsletter is submitted as Exhibit C and as an explanation of Act No. 94–320 and the changes in voting made by that Act." The specifically referenced newsletter was an official document, in contrast to the newspaper article in this case. More importantly, the newspaper article in this case was not brought to the attention of the Attorney General with anything approaching the same degree of explicitness as was the newsletter in the 1994 submission letter. In the absence of a more specific incorporation by reference of this secondary material into the State's submission letter, the ambiguity remains.

Finally, the State points to the fact that the Department of Justice raised questions on its own about other aspects of the Act in its October 7, 1996, letter. It argues that "[i]f there was something the Department wanted but did not get, the State had no idea what it was before the Department stopped asking questions." [12] But the burden of persuasion rests with the State, *see McCain*, 465 U.S. at 257, 104 S.Ct. at 1050, as does the burden of submitting an "unambiguous description of proposed changes," *see Young*, 520 U.S. at ——, 117 S.Ct. 1228, 1237, 137 L.Ed.2d 448 (1997) (summarizing *McCain*), and that burden was not shifted in this case

---

**10.** *Ward v. Alabama,* civil action no. 98–D–1156–N, brief of the State of Alabama, James Bennett, and Charles W. Story in opposition to section 5 claims, filed October 20, 1998, at 5.

**11.** The State's arguments are actually more pointed than that. The changes that were submitted for preclearance in 1994 included the addition of the very language in § 17–10–5 ("or the address where the voter regularly receives mail") the deletion of which is challenged in this case. If the submission involving deletion of this language in the 1996 Act was not clear enough, says the State, neither was the submission involving addition of the same language in the 1994

Act. The net result would be that the addition of the language in 1994 could not be enforced, thus achieving the same result as an enforceable deletion of the language in 1996. It is a nice argument, but it fails. As we explain hereafter in the text, the 1994 submission was clear enough about the change to § 17–10–5 for preclearance of that amendment, while the 1996 submission was not as clear, nor was it clear enough.

**12.** *Ward v. Alabama,* civil action no. 98–D–1156–N, brief of the State of Alabama, James Bennett, and Charles W. Story in opposition to section 5 claims, filed October 20, 1998, at 5.

with respect to § 17–10–5(a) merely because the Attorney General raised questions about other provisions.

We therefore conclude that the State has not yet fulfilled its obligation to obtain preclearance of the change in the State of Alabama's absentee ballot delivery laws effected by Act No. 96–885 and codified at Ala.Code § 17–10–5(a).

We do feel it only fair to note that no one questions the good faith of the state officials involved in the submission at issue in this case. Neither the Department of Justice, the attorneys representing the private plaintiffs, nor any member of this Court believes that those officials attempted to slip something by the Attorney General. All the evidence indicates the ambiguity in the submission request was unintentional. The standard we apply, however, is an objective one, and under that standard we are required to resolve even unintentional ambiguities against preclearance.

### C.

We end our discussion of the merits of this case with a reply to Part I of Judge Thompson's separate concurring opinion, which we find a bit puzzling.[13] That part of his concurring opinion takes issue with one sentence of this opinion, the sentence in which we state: "Had the State clearly stated in its submission letter that all changes indicated on the face of the enclosed redlined version of the Act should be treated as voting changes submitted for preclearance by the Attorney General, that might satisfy the requirement that the proposed changes be clearly identified." Supra at 972–973. The reason we are somewhat puzzled by Judge Thompson's concurring opinion is that when it gets down to the nitty gritty of actually taking a position on the matter, the position it takes is not materially different from the one it criticizes us for taking.

We say that clearly identifying the changes indicated in a redlined version of the amendatory legislation as the ones for which preclearance is sought "might satisfy the clear statement requirement." *See* supra at 973. Similarly, the concurring opinion says that additional materials "may be necessary," that "[i]t may be necessary to look beyond the redlining," and that "[i]n other words redlining may or may not be sufficient." *See* concurring op. of Thompson, J., at 977. Thus, the basis upon which Part I of the concurring opinion is written is the difference between "might satisfy" and "may or may not be sufficient." That difference is too subtle for us to grasp.

There being no real difference between our positions on the matter, Judge Thompson's concurring opinion is left to the age-old device of erecting a straw man, which it proceeds to tear down. For example, it accuses us of suggesting that the State's burden does not include identifying in a clear manner each change for which it seeks preclearance. See concurring op. at 976. Not only do we not suggest that, but the very basis of our decision that the amendment to § 17–10–5 was not precleared is the State's failure to clearly identify that amendment as one of the changes for which preclearance was sought.

For the same reason, it cannot fairly be said that we "appear" to read 28 C.F.R. § 51.27(c)'s requirement that the change submitted be readily apparent on the face of the documents "very narrowly." *See* concurring op. Of Thompson, J., at 977. If the submission letter and an accompanying redlined version of the legislation make "readily apparent" on their face what the changes sought to be precleared are, then the "readily apparent" requirement is satisfied. If not, not. This case involves a situation in which the changes sought to be precleared were not all readily apparent on the face of the documents, which is why we reach the decision we do in this case. In another case involving redlining, the documents—to borrow the concurring opinion's words—"may or may not be sufficient." In recognizing that, we do not read § 51.27(c)'s language "very narrowly," but just as it is written.

Judge Thompson's concurring opinion says we are "suggesting that a State can be absolved of the specificity requirement." See

---

**13.** This Part C of our opinion is the part Judge Thompson refers to in the first sentence of the

last paragraph in Part I of his concurring opinion.

concurring op. 977. It is strange to infer from an opinion vigorously enforcing a requirement a suggestion of absolution from that requirement. In any event, we no more suggest absolution from the specificity requirement when we say that in different facts documents including a redlined version of legislation "might satisfy the requirement," than the concurring opinion suggests absolution by saying that it "may or may not be sufficient." Finally, as to the admonition that "the court should be inviting the State to be more open and forthcoming with information, not less so," concurring op. of Thompson, J., at 977, we have not issued an invitation of any sort to any party. Nor do we view it as our role to invite any party to do anything in the future. Courts sit to apply the law, not to suggest policy.

### D.

As to the appropriate remedy in this case, "[n]o new voting practice is enforceable unless the covered jurisdiction has succeeded in obtaining preclearance," *Lopez*, 519 U.S. at ——, 117 S.Ct. at 347. The State may not enforce the revision to § 17–10–5 until it has sought and obtained preclearance of this change, by the Attorney General or the United States District Court for the District of Columbia. No further order is necessary at this time, however, as the parties have already filed with this court a joint remedial plan, by which they agreed to abide should this court rule as we have.

MYRON H. THOMPSON, District Judge, concurring in the judgment:

At issue in these voting rights cases is whether the State of Alabama properly submitted Alabama Code § 17–10–5(a), as amended by Alabama Act No. 96–885, to the United States Attorney General for preclearance review as required by § 5 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973c. Although I agree with the majority's conclusion that § 17–10–5(a) was not properly submitted and therefore did not receive preclearance, both the panel opinion by Judge Carnes and the special concurrence by Judge DeMent contain language which, I believe, could potentially undermine the remedial scheme prescribed by Congress in § 5 of the Voting Rights Act. For that reason, I concur only in the judgment of the court.

### I.

I take issue primarily with the panel opinion's suggestion in dictum that the amendment to § 17–10–5(a) might have been properly submitted if the State had "clearly stated in its submission letter that all changes indicated on the face of the enclosed redlined version of [Act No. 96–885] should be treated as voting changes submitted for preclearance by the Attorney General." *Ante*, at 972. In my view, to suggest that such a general request for preclearance could constitute a proper submission under § 5 would invite the State and other jurisdictions subject to § 5 to undermine the preclearance process by making their submissions as broad and as ambiguous as possible.

The Supreme Court has held that when a jurisdiction subject to § 5 wishes to utilize the administrative preclearance process, it must "in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act." *Allen v. State Board of Elections*, 393 U.S. 544, 571, 89 S.Ct. 817, 834, 22 L.Ed.2d 1 (1969). But it is not enough for a State to send a piece of legislation to the Attorney General along with a general request for preclearance. *See McCain v. Lybrand*, 465 U.S. 236, 247–48, 104 S.Ct. 1037, 1045, 79 L.Ed.2d 271 (1984). The submitting authority "must identify with specificity *each change* that it wishes the Attorney General to consider." *Clark v. Roemer*, 500 U.S. 646, 658, 111 S.Ct. 2096, 2104, 114 L.Ed.2d 691 (1991) (emphasis added).

As the Court explained in *Clark*, the requirement that a State identify each change is necessary if the Attorney General is to perform her already considerable duties under § 5. 500 U.S. at 658, 111 S.Ct. at 2104. The Attorney General reviews literally thousands of voting changes each year and must for each one analyze, within the 60–day preclearance period, demographic data, voting patterns and other factors in order to make

the statutory judgment whether the change has a discriminatory purpose or effect. *Id.*

Congress recognized that the Attorney General could not, in addition to these duties, also monitor and identify every voting change in every jurisdiction subject to § 5. *Id.* "Because of the acknowledged and anticipated inability of the Justice Department—given limited resources—to investigate independently all changes with respect to voting enacted by States and subdivisions covered by the Act," Congress placed the burden on the jurisdictions subject to § 5 to identify, submit, and receive approval for each and all such changes as a condition of their implementation. *Id.* (quoting *McCain*, 465 U.S. at 247, 104 S.Ct. at 1044–45); *see also Young v. Fordice*, 520 U.S. 273, ——, 117 S.Ct. 1228, 1237, 137 L.Ed.2d 448 (1997) (summarizing *McCain*, 465 U.S. at 249, 255–57 104 S.Ct. at 1045–46, 1048–50). The State's burden is not simply to identify all changes clearly, as the majority suggests, but rather to identify, in an unambiguous and recordable manner, each change for which it seeks preclearance.

In my view, the State could not have satisfied its burden in this case by stating in its submission letter that the Attorney General should review all changes indicated on the face of the enclosed legislation. A request to preclear all changes on the face of some attached legislation does not identify, in an unambiguous and recordable manner, each change for which preclearance is sought. Indeed, the Supreme Court has repeatedly rejected the adequacy, under § 5, of such 'blanket submissions' of legislation for preclearance. *See Clark*, 500 U.S. at 659, 111 S.Ct. at 2104; *McCain*, 465 U.S. at 256–57, 104 S.Ct. at 1049–50; *Allen*, 393 U.S. at 571, 89 S.Ct. at 834. When a copy of new legislation is sent to the Attorney General along with a general request for preclearance, the Court has observed, the potential for ambiguity is "particularly pronounced." *McCain*, 465 U.S. at 247, 104 S.Ct. at 1045.

Indeed, the regulations the Attorney General has promulgated to enforce § 5 reflect this important concern. 28 C.F.R. § 51.27(c) provides: "If the change affecting voting either is not readily apparent on the face of the documents, provided under paragraphs (a) and (b) of this section or is not embodied in a document, a clear statement of the change explaining the difference between the submitted change and the prior law or practice, or explanatory materials adequate to disclose to the Attorney General the difference between the prior and proposed situation with respect to voting." [1] The majority appears

---

1. Section 51.27 provides in full:
   "Each submission should contain the following information or documents to enable the Attorney General to make the required determination pursuant to Section 5 with respect to the submitted change affecting voting:
   (a) A copy of any ordinance, enactment, order, or regulation embodying a change affecting voting.
   (b) A copy of any ordinance, enactment, order, or regulation embodying the voting practice that is proposed to be repealed, amended, or otherwise changed.
   (c) If the change affecting voting either is not readily apparent on the face of the documents, provided under paragraphs (a) and (b) of this section or is not embodied in a document, a clear statement of the change explaining the difference between the submitted change and the prior law or practice, or explanatory materials adequate to disclose to the Attorney General the difference between the prior and proposed situation with respect to voting.
   (d) The name, title, address, and telephone number of the person making the submission.
   (e) The name of the submitting authority and the name of the jurisdiction responsible for the change, if different.
   (f) If the submission is not from a State or county, the name of the county and State in which the submitting authority is located.
   (g) Identification of the person or body responsible for making the change and the mode of decision (e.g., act of State legislature, ordinance of city council, administrative decision by registrar).
   (h) A statement identifying the statutory or other authority under which the jurisdiction undertakes the change and a description of the procedures the jurisdiction was required to follow in deciding to undertake the change.
   (i) The date of adoption of the change affecting voting.
   (j) The date on which the change is to take effect.
   (k) A statement that the change has not yet been enforced or administered, or an explanation of why such a statement cannot be made.
   (*l*) Where the change will affect less than the entire jurisdiction, an explanation of the scope of the change.
   (m) A statement of the reasons for the change.
   (n) A statement of the anticipated effect of the change on members of racial or language minority groups.

to read this subsection very narrowly, suggesting that the State may be able to submit a large and complex piece of legislation and need only "note generally" that all the changes "affect voting." Subsection (c) does not say "the fact" that there is a "change affecting voting" must be "readily apparent on the face of the documents ... or ... embodied in a document," but that the change itself must be readily apparent. The change *as it affects voting* may or may not be readily apparent from the face of the legislation or embodied in it, and it may or may not be apparent from any added redlining as well. Additional "explanatory materials adequate to disclose to the Attorney General the difference between the prior and proposed *situation* with respect to voting" may be necessary to give context to the change and thereby reflect the nature of the change. It may be necessary to look beyond the redlining and the face of the legislation, perhaps even to other legislation, to understand "the difference between the prior and proposed *situation* with respect to voting." In other words, redlining may or may not be sufficient to meet subsection (c)'s requirements.

The Supreme Court has also recognized that to relax the requirement that a submission clearly identify each change submitted would not only "add to the Attorney General's already redoubtable obligations," but also "diminish covered jurisdictions' responsibilities for self-monitoring" and create an incentive for States to makes their submissions as

broad and as ambiguous as possible. *Clark,* 500 U.S. at 658, 111 S.Ct. at 2104. My concern is that, by suggesting that a State can be absolved of the specificity requirement, the majority implicitly creates just such an incentive. The thrust of the majority opinion is in the wrong direction. Rather, faithful to *Clark,* the court should be inviting the State to be more open and forthcoming with information, not less so.[2] The issue is how § 5 can be effectively enforced, not how it may be gotten around.

We must remember that Congress enacted the Voting Rights Act of 1965 in response to nearly a century of "unremitting and ingenious defiance" of the fifteenth amendment in certain parts of the country.[3] *South Carolina v. Katzenbach,* 383 U.S. 301, 309, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). Congress concluded that case-by-case litigation under previous voting rights legislation had been inadequate to uncover and remedy systematic voting discrimination. *Id.* at 328, 86 S.Ct. at 818. Even successful lawsuits under previous regimes were unusually time-consuming and too often resulted merely in the enactment of new, more ingenious practices of discrimination. *See McCain,* 465 U.S. at 243–44, 104 S.Ct. at 1043–44 (citing the legislative history of the Voting Rights Act). With the preclearance mechanism of § 5, Congress attempted "to shift the advantage of time and inertia from the perpetrators of

(o) A statement identifying any past or pending litigation concerning the change or related voting practices.

(p) A statement that the prior practice has been precleared (with the date) or is not subject to the preclearance requirement and a statement that the procedure for the adoption of the change has been precleared (with the date) or is not subject to the preclearance requirement, or an explanation of why such statements cannot be made.

(q) For redistrictings and annexations: the items listed under § 51.28(a)(1) and (b)(1); for annexations only: the items listed under § 51.28(c)(3).

(r) Other information that the Attorney General determines is required for an evaluation of the purpose or effect of the change. Such information may include items listed in § 51.28 and is most likely to be needed with respect to redistrictings, annexations, and other complex changes. In the interest of time

such information should be furnished with the initial submission relating to voting changes of this type. When such information is required, but not provided, the Attorney General shall notify the submitting authority in the manner provided in § 51.37."

2. Indeed, the regulations promulgated by the Attorney General, in particular 28 C.F.R. § 51.27, reflect this purpose. *See supra* note 1.

3. The fifteenth amendment to the United States Constitution provides:

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

Section 2. The Congress shall have the power to enforce this article by appropriate legislation."

the evil to its victims." *South Carolina v. Katzenbach*, 383 U.S. at 328, 86 S.Ct. at 818.

Were the State to follow the majority's suggestion, the advantage of time and inertia would shift away from the victims and back to the State. The Attorney General would then bear the burden of uncovering voting changes. She would further bear the burden of doing so within the 60–day statutory time limit and with limited financial resources. The administrative preclearance mechanism would cease to function effectively, both as a speedy alternative to the judicial preclearance mechanism and as a way to ensure that all new voting changes are in fact scrutinized by the federal government before they can be enforced. Our task, whatever our individual views on a particular course chosen by Congress, is to enforce the law vigorously (rather than reluctantly), as we find it, to assure that its enforcement mechanism remains a real, rather than a paper, tiger.

Finally, after I wrote this concurrence, the majority expanded its opinion to address some of the concerns I raise. To the extent my concurrence has generated a clarification by the majority that they and I are not at odds, I am pleased.

## II.

I also take issue with Judge DeMent's assertion that § 5 is unconstitutional and has proved to be burdensome. With all due respect to Judge DeMent, the Supreme Court has expressed its final judgment on the constitutionality of § 5, *see South Carolina v. Katzenbach*, 383 U.S. at 335, 86 S.Ct. at 822, and Congress has expressed its views on the burden issue not once but repeatedly, *see* Voting Rights Act of 1965, Pub.L. No. 89–110, § 5, 79 Stat. 438 (1965); Voting Rights Act Amendments of 1970, Pub.L. No. 91–285, § 3, 84 Stat. 314, 315 (1970) (extending the preclearance requirement for five years); Voting Rights Act Amendments of 1975, Pub.L. No. 94–73, § 101, 89 Stat. 400 (1975)

(extending the preclearance requirement for seven years); Voting Rights Act Amendments of 1982, Pub.L. No. 97–205, § 2(a)–(b), 96 Stat. 131–33 (1982) (extending the preclearance requirement until 2007); *see also* S.Rep. No. 97–417, at 43–62 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 221; Laughlin McDonald, *The 1982 Extension of Section 5 of the Voting Rights Act of 1965: The Continued Need for Preclearance*, 51 Tenn.L.Rev. 1, 47–54 (1983).

· Finally, Congress has rejected Judge DeMent's suggestion that a case-by-case approach is adequate to address what Congress found to be systemic voting-rights violations in certain areas of this country. As I have already stated, because even successful lawsuits under previous regimes were unusually time-consuming and too often resulted merely in the enactment of new, more ingenious practices of discrimination, *see McCain*, 465 U.S. at 243–44, 104 S.Ct. at 1043–44 (citing the legislative history of the Voting Rights Act), Congress enacted § 5 so as "to shift the advantage of time and inertia from the perpetrators of the evil to its victims." *South Carolina v. Katzenbach*, 383 U.S. at 328, 86 S.Ct. at 818.

IRA DE MENT, District Judge, concurring specially:

For the reasons stated in his opinion, I agree with Judge Carnes that the State of Alabama did not comply with § 5 of the Voting Rights Act, 42 U.S.C. § 1973c. In particular, I note that the State failed to clearly identify in its submission letter the changes that it sought to preclear, and, therefore, as required by *Clark v. Roemer*, 500 U.S. 646, 656, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991), the court has resolved all ambiguities against the submitting authority.

However, I wish to go on record, stating with emphasis, that I agree entirely with Mr. Justice Black's dissenting opinion [1] in *South*

---

1. Furthermore, I note that other members of the Court have also expressed similar misgivings. *See Dougherty County, Ga. Bd. of Educ. v. White*, 439 U.S. 32, 48 n. 1, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978) (citing *Allen v. State Board of Elections*, 393 U.S. 544, 586, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (Harlan, J., concurring and

dissenting); *Holt v. Richmond*, 406 U.S. 903, 92 S.Ct. 1602, 31 L.Ed.2d 814 (1972) (Burger, C.J., concurring); *Georgia v. United States*, 411 U.S. 526, 545, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973) (Powell, J., dissenting)); *see also United States v. Board of Comm'rs*, 435 U.S. 110, 141, 98 S.Ct.

*Carolina v. Katzenbach,* 383 U.S. 301, 356, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). I do not write angrily, but I do write in defense of every United States District Judge who is precluded from reaching the merits of a case falling within the purview of § 5 of the Voting Rights Act. Not only does § 5 require states to grovel at the feet of the Attorney General or the District Court for the District of Columbia, but also it strips southern Federal District Judges of their constitutional power under Article III.

Mr. Justice Black, in his *Katzenbach* dissent, articulated two grounds upon which he reasoned that § 5 is unconstitutional. *See Katzenbach,* 383 U.S. at 357, 86 S.Ct. 803. First, he argued that § 5 is unconstitutional because it grants the District Court for the District of Columbia the power to approve or reject a state law which has in no way become operative, and this action amounts to the rendering of an advisory opinion, which is specifically prohibited by the Constitution.[2] *Id.* Mr. Justice Black argued, and I agree, that the appropriate manner by which to protect the principles embodied in the Voting Rights Act is "to invalidate a state law once enacted and operative on the ground that it intrudes into the area of supreme federal power. A federal law which assumes the power to compel the States to submit in advance any proposed legislation they have for approval by federal agents approaches dangerously near to wiping the States out as useful and effective units in the government of our country." *Id.* at 360, 86 S.Ct. 803.

Mr. Justice Black also argued that § 5 violated the principles of Federalism embodied in the Tenth Amendment. If the provisions of the Constitution "which limit the power of the Federal Government and reserve other power to the States are to mean anything, they mean at least that the States have power to pass laws and amend their constitutions without first sending their officials hundreds of miles away to beg federal authorities to approve them." *Id.* at 359, 86

S.Ct. 803. Mr. Justice Black further articulated his sentiments in *Allen v. State Bd. of Elections,* 393 U.S. 544, 595, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), when he stated, as follows: "I doubt that any of the 13 Colonies would have agreed to our Constitution if they had dreamed that the time might come when they would have to go to a United States Attorney General or a District of Columbia court with hat in hand begging for permission to change their laws."

Furthermore, thirty-two years after Mr. Justice Black expressed his concerns with regard to § 5, the difficulties in implementing such a provision have become apparent. Under the current system, states must seek approval for every conceivable change that affects voting, resulting in a horrendous workload for the Attorney General's Office. For instance, in 1991, the statistics showed that "the Attorney General reviews an average of 17,000 electoral changes each year...." *Clark v. Roemer,* 500 U.S. 646, 658, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991). "Because of the acknowledged and anticipated inability of the Justice Department—given limited resources—to investigate independently all changes with respect to voting," 500 U.S. at 658–59, 111 S.Ct. 2096, the Court has heaped upon southern states the additional responsibility to definitively, meticulously, and unambiguously identify the changes submitted for preclearance.

In the humble opinion of this United States District Judge, the problem of an "overworked Attorney General" can be remedied by returning to the appropriate judicial forum the power to review and remedy voting rights abuses. This would not result in a plethora of litigation in the federal court system because advisory opinions would not be required or rendered. Instead, only those provisions actually implemented and that arguably contained a discriminatory purpose or effect could be subsequently challenged in a local federal court.

965, 55 L.Ed.2d 148 (1978) (Stevens, J., dissenting).

**2.** Article III of the Constitution limits judicial power to "cases" or "controversies." "[T]his requirement helps assure that courts will not pass upon abstract, intellectual problems, but will adjudicate concrete, living contests between adversaries." *Federal Election Comm'n v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 1784, 141 L.Ed.2d 10 (1998).

The Voting Rights Act represents an enduring symbol of this Nation's commitment to fairness in our most basic and cherished liberty—the right to vote—and I do not take issue with its remaining provisions; indeed, I support them. Until Congress sees fit to change § 5 of the Voting Rights Act, or until the Supreme Court sees fit to revisit its holding in *Katzenbach,* neither I, nor any other district judge, am at liberty to ignore the Act or the Court's interpretation of it. Therefore, until such time as Congress repeals § 5, I remain committed to my duty to uphold and apply the law.